Rene A. DUBE, etc., Plaintiff, Appellee,

v.

**PITTSBURGH CORNING, et al.,
Defendants, Appellees,**

Owens–Illinois, Inc., et al., Defendants,
Third–Party Plaintiffs, Appellants.

Rene A. DUBE, etc., Plaintiff, Appellee,

v.

**PITTSBURGH CORNING, et al.,
Defendants, Appellees,**

Eagle–Picher Industries, Inc.,
Defendant, Third–Party
Plaintiff, Appellant.

Nos. 88–1679, 88–1740.

United States Court of Appeals,
First Circuit.

Heard Dec. 6, 1988.

Decided March 27, 1989.

Linda A. Monica with whom Peter J. Rubin, Bernstein, Shur, Sawyer & Nelson, Edward S. MacColl, Mark G. Furey and Thompson, McNaboe, Ashley & Bull, Portland, Me., were on brief for appellants Owens–Illinois, Inc., and Raymark Industries, Inc.

Paul G. Gaston with whom Joe G. Hollingsworth, Catherine R. Baumer and Spriggs & Hollingsworth, Washington, D.C., were on brief for appellant Eagle–Picher Industries, Inc.

Scott D. Austin, Torts Branch, Civ. Div., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Civ. Div., J. Patrick Glynn, Director, Torts Branch, Harold J. Engel, Deputy Director, Torts Branch, David S. Fishback and Jay M. Siegel, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., were on brief for the U.S.

Before CAMPBELL, Chief Judge, COFFIN and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

These are consolidated appeals of four manufacturers of asbestos, following judgment for the government on appellants' claims for contribution for asbestos-related damages arising from the Portsmouth Naval Shipyard (PNS) in Kittery, Maine. The trial court[1] found that the government was negligent under Maine law in its operation of the shipyard, a government-owned facility. The court found that this negligence was the proximate cause of death of Joan Dube, the daughter of a shipyard worker, who had been exposed to asbestos fibers carried home on her father's work clothes.[2] However, on its reading of the case law concerning the discretionary function exception to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a), the court de-

---

1. The case was tried before United States Magistrate Hornby, pursuant to consent of the parties and 28 U.S.C. § 636(c).

2. The court went on to allocate the government's share of contribution to the settlement of the claim of Joan Dube's estate, in the event this court determined that the discretionary function exception does not apply.

termined that the government was immune from liability. We conclude that the exception is inapplicable on the record in this case, and reverse.

## I. BACKGROUND

From age nine and until her marriage, from 1959 to 1973, Joan Dube was exposed to asbestos dust from her father's work clothes. Throughout this period, her father worked at PNS as a pipe insulator and routinely handled asbestos products. Before her death in 1984 of mesothelioma, Joan Dube initiated an action against four asbestos manufacturers whose products were used at PNS. These claims were eventually settled for the amount of $512,-000.

The manufacturers—third party plaintiffs Raymark Industries, Inc., Owens–Illinois, Inc., Celotex Corp., and Eagle–Picher Industries, Inc.—brought contribution actions against the United States under the FTCA, 28 U.S.C. §§ 1346(b), 2671–2680. After a bench trial, the district court found the following:

–Joan Dube's death resulted from her exposure to asbestos;

–the asbestos was produced by third party plaintiffs and used at PNS, where her father worked as a civilian for the United States Navy;

–the United States knew or should have known in October of 1964 that asbestos could cause mesothelioma in people like Joan Dube exposed in a domestic context; medical science cannot yet determine which exposures to asbestos over a period of time actually cause mesothelioma;

–the United States Navy and PNS had no policies or practice, prior to 1964 or thereafter through the period of Joan Dube's exposure, either to warn of the dangers of asbestos exposure to workers' family members, or to protect these "domestic bystanders";

–the United States was negligent under Maine law for failing to warn, either directly or through workers, domestic bystanders of the dangers of asbestos exposure after it learned of those dangers in 1964; all of Joan Dube's exposure, from 1959 to 1973, was the legal cause of her death;

–considering the respective degrees of fault and causation, the United States was responsible for one-third of Joan Dube's damages.

None of these findings are challenged on appeal. Rather, the sole issue before us is whether the trial court properly applied the discretionary function exception of the FTCA. The United States conceded, and the court recognized, that the Navy had never adopted or considered a policy of warning domestic bystanders of asbestos hazards. Yet in the court's view, since it *could* have considered and rejected a policy of warning or protecting domestic bystanders, its failure to warn cannot lead to liability under the discretionary function exception.[3]

The manufacturers press two arguments on appeal. First, they argue that the Supreme Court's opinion in *Berkovitz v. United States,* — U.S. ——, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), handed down four days after the trial court's disposition of this case, requires reversal based on Navy officials' failure to comply with mandatory regulations. Second, they argue more generally that the Navy's failure to warn domestic bystanders does not fall within the scope of discretionary activity to which the exception was meant to apply. We address these arguments in turn.

## II. ALLEGED FAILURE TO COMPLY WITH MANDATORY REGULATIONS

In *Berkovitz,* the Court held that mandatory regulations can remove an official's discretion, and thereby withdraw his conduct from the scope of the discretionary

---

**3.** The discretionary function exception provides: The provisions of this chapter and section 1346(b) of this title shall not apply to—
     (a) Any claim based upon ... the exercise or performance or the failure to exercise or

perform a discretionary function or duty on the part of a federal agency ..., whether or not the discretion be abused.
28 U.S.C. § 2680(a).

function exception. At issue in that case was a government agency's failure to determine that certain required tests for purity and safety of a polio vaccine had been satisfied before its release for public use. Because the applicable statutes and regulations left no room for the exercise of discretion by the government employees charged with their implementation, the Court concluded that the failure of agency personnel to assure compliance with the testing requirements before licensing the vaccine was actionable under the FTCA. The manufacturers point to two Navy regulations which they say remove the Navy's discretion not to warn domestic bystanders.

### A. *Failure to Warn of a Known Hazard.*

The manufacturers base their *Berkovitz* argument chiefly on one of the Navy's regulations contained in the Department of Navy Safety Precautions for Shore Activities, NAVSO P–2455 (April 1965). Section 0103.4.b provides:

> *Warning Others.* Each individual concerned shall warn others whom he believes to be endangered by known hazards or by failure to observe safety precautions.

The manufacturers argue that this mandatory regulation, when combined with the trial court's finding that the Navy failed to warn either its workers or their families of the dangers of domestic exposure to asbestos, dictates reversal under *Berkovitz.* Although this argument is not without force, and is supported by PNS commanders' testimony, we prefer not to rest our conclusion on it.

Reading the Safety Precautions for Shore Activities in their entirety, we think it is apparent that the quoted subsection outlines the responsibilities of on-site workers, as distinct from their supervisors.[4] Section 0103.4 is titled "Operating Personnel," and follows § 0103.1 directed to "Commanding Officers," § 0103.2 directed to "Safety Officer," and § 0103.3 directed to "Supervisory Personnel." In this context, § 0103.4 appears directed at having on-site workers warn their fellow workers of dangerous conditions in the immediate work areas of which they have specific, actual knowledge. We do not disturb the trial court's determination that, as a matter of Maine tort law, the Navy was properly charged with knowledge of the risk to domestic bystanders as of October 1964. Yet it would require a leap of logic to then attribute such constructive knowledge to on-site workers with no actual knowledge of the danger.[5] Even if the Navy's constructive knowledge of the risk to domestic bystanders could be imputed to workers, it would not advance the manufacturers' case. Section 0103.4.b requires the person concerned to warn others "whom he *believes* to be endangered by known hazards." *Id.* (emphasis added). That one believes another to be in danger means subjective, actual knowledge. The manufacturers have not shown that any PNS asbestos worker actually believed that domestic bystanders were at risk and failed to inform Joan Dube's father.

As a separate challenge to the manufacturers' *Berkovitz* claims, the United States argues that § 0103.4 cannot serve to re-

---

4. We recognize that Admiral William Hushing, Commander of PNS from 1964 to 1969, and Admiral Westfall, Commander of PNS from 1971 to 1974, testified that they understood § 0103.4 to apply to everyone in the shipyard, including supervisory personnel. The record is otherwise barren of authoritative interpretation or background of the scope of § 0103.4. We decline to rest our analysis of the regulation on such a slight basis. We do not believe that the subjective understanding of a base commander can bind the Navy to his personal interpretation of the regulation. At best the regulation is ambiguous, militating against its service as a vehicle for the imposition of significant government liability under *Berkovitz.*

5. Under normal tort law precepts, Navy officers and supervisors as operators of the shipyard—not workers—are charged with knowledge of the foreseeable dangers of asbestos exposure. *See* Restatement (Second) of Torts § 314B(1) (1965) (discussing duty of master or "person who has duties of management" to protect employees from known danger). *See also* W. Page Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Torts* § 80 (1984) (discussing *employer's* duty to provide a safe place to work and to give warning of dangers of which the employee might reasonably be expected to remain ignorant).

move Navy discretion because it is not sufficiently "specific." In reviewing the regulatory framework at issue in *Berkovitz*, the Court characterized the statutes and regulations that served to remove agency employees' discretion as "a specific statutory and regulatory directive." 108 S.Ct. at 1962. The Court indicated more generally: "When a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply." *Id.* at 1963. The Court engaged in a painstaking analysis of the precise statutory mandate and associated regulations establishing the Division of Biologic Standards' obligation to assure compliance with adequate testing procedures before licensing polio vaccines.

We view the government's argument as persuasive as applied to § 0103.4. The language of the regulation is so general that it does no more than establish a general policy of warning fellow workers of "known dangers." *Cf. General Public Utilities Corp. v. United States*, 551 F.Supp. 521, 526 (E.D.Pa.1982) (concluding that "plain language, legislative history, and regulations" pertaining to the Energy Reorganization Act of 1974 established that NRC had a duty to disseminate warnings of design defects in nuclear power plants). Even assuming, as understood by the Base Commander, that § 103.4 applied to supervisory personnel, the broad language of the regulation suggests that those charged with its implementation retained wide latitude regarding its execution.[6] Thus there was no "specific mandatory directive" to warn comparable to the regulations analyzed in *Berkovitz*.

B. *Failure to Insure Adherence to Safety Precautions.*

█ Through March of 1970, § 0103.3 of the Safety Precautions for Shore Activities provided:

It is the responsibility of supervisory personnel to see that safety precautions are strictly observed in their own work area.

This regulation differs from § 0103.4 in two important respects. First, it is clearly directed to supervisors. Supervisors may be sufficiently analogous to "management" in the private sector that the Navy's constructive knowledge of asbestos dangers is properly attributable to them. Second, the mandate is more precise both in tone ("strictly observed") and because it incorporates potentially detailed safety precautions tailored to particular work areas. If required safety precautions for the work area of Joan Dube's father were violated, and if compliance would have averted Dube's exposure, then the failure of the father's supervisor to assure strict observance would appear to render the discretionary function exception inapplicable under *Berkovitz*.

The manufacturers claim that uncontroverted evidence shows that safety precautions directed to the handling of asbestos at PNS were not adhered to. Yet the existence of and compliance with mandatory safety precautions governing the work area of Joan Dube's father is an open question. The Safety Precautions for Shore Activities, NAVSO P–2455, CH–1 (June 1967), indicate only that "Each individual concerned shall wear or use protective clothing or equipment of the type indicated and approved for the safe performance of his work or duty." § 0103.4.c. These Safety Precautions do not specify, however, whether any such protective clothing or equipment was required to be used by Joan Dube's father. Through March of 1970, the Safety Precautions provided:

The following precautions *should* be taken in any dust making operations involving asbestos products:

a. Provide permanent general ventilation. . . .

6. We note that despite the broad language of § 0103.4, a mandatory duty to warn workers of the risk to domestic bystanders could be made out by showing that the Navy had established a policy or practice of requiring such warnings. *See, e.g., Berkovitz*, 108 S.Ct. at 1964 (discussing adoption of a statutorily authorized—but not required—mandatory policy as removing conduct from the scope of the discretionary function exception). The record before us fails to demonstrate such a policy or practice. Instead the manufacturers have demonstrated, and the trial court found, that PNS had no policy of giving such warnings.

b. Install exhaust hoods over saws and other dust making machine tools.

...

d. Use industrial vacuum cleaners in lieu of dry sweeping floors and other surfaces.

*Id.* at § 2058.2 (emphasis added). As articulated in chapter one of the Safety Precautions, "Precautions which are not mandatory but are recommended or advisory in nature are indicated by use of the word 'should'." § 0102.2. Thus it is not apparent from the Safety Precautions whether any *mandatory* precautions were applicable to Dube's father's work area through March of 1970. The Safety Precautions were changed in 1970, and again in 1971, to incorporate detailed and mandatory provisions concerning asbestos handling.[7] The trial court specifically declined to make findings regarding the alleged failure of PNS to assure compliance with specific safety precautions pertaining to the handling of asbestos, and therefore could not have considered the relevance of the changes in its alternative judgment allocating liability. In any event, the government continues to dispute the existence and violation of such precautions. If such were necessary to resolve this case, we would have to remand for additional findings.[8]

**7.** The revised precautions provide:

The following precautions *are required* for the safe handling of asbestos products:

**a. General Precautions:**

(1) The Industrial Hygiene Division of the Medical Department *shall* evaluate the level of asbestos exposure and will recommend engineering control measures for dust controls and provide, at least twice yearly, indoctrination of insulation workers in measures of personal protection.

(2) Asbestos dust concentrations *shall* be controlled so as not to exceed the threshold limit value for asbestos as stated in the current BUMED INSTRUCTIONS 6260.3 series titled "Threshold limit values for airborne toxic materials."

(3) Scrap material *shall* be wet down before shoveling, hauling or dumping.

(4) Discarded and scrapped asbestos materials *shall* immediately be placed in plastic bags which are then to be sealed for removal and disposal.

Safety Precautions for Shore Activities, NAVMAT P-5100—Change 2, at Ch. 20, p. 20-22, -23 (March 1970) (emphasis added). Subsequent subsections are directed at fabrications and removal operations. Subsection (c), "Removal, Repair and Installation," in part provides:

(2) Personnel engaged in ripout operations will be provided and required to wear clean coveralls at the beginning of each shift.... Clean or single-use coveralls shall be provided daily.

*Id.* at 20-23. The precautions were again amended in February of 1971, with further instructions regarding the disposal or laundering of coveralls exposed to asbestos dust. NAVSHIPS Instruction 5100.26 at 3, 5-6 (Feb. 9, 1971). Each of these regulations is directed at control of asbestos dust, and is thus causally related to Joan Dube's exposure. *See* note 8, *infra*.

**8.** The trial court viewed the existence and breach of such work-area safety precautions as irrelevant *as an independent basis of tort liability* insofar as they were not designed to protect domestic bystanders. While it may be true that the regulations did not create a duty to Joan Dube, this does not dispose of their relevance to the application of the discretionary function exception.

Under the FTCA, the government is initially liable as a private person under *state* tort law. The trial court found, and it is not contested on appeal, that the Navy negligently breached its duty of due care to Joan Dube by failing to warn her of the risks of asbestos exposure. The government asserts that the negligence is not actionable because it falls within the discretionary function exception. The manufacturers dispute this characterization. They say that the Navy's failure to protect Joan Dube could not be discretionary, because Navy regulations mandated certain safety precautions which, if followed, would have prevented Joan Dube's exposure. The regulations are relevant not in establishing a duty, but in establishing whether Navy officials' failure to take steps to protect Joan Dube was discretionary. If Navy officials failed to implement mandatory measures designed to regulate the exposure of workers to asbestos dust, their failure was not within the discretionary function exception under *Berkovitz*. The only remaining issue is whether this conduct is causally related to Joan Dube's exposure.

The Navy could certainly have discharged its duty to Joan Dube by taking steps to minimize or avoid her exposure altogether. This could have been accomplished by assuring that asbestos dust was properly controlled at PNS, for example by ventilating areas where asbestos dust was created or minimizing the creation of dust altogether. Given the trial court's determination that, as of 1964, the risk of asbestos exposure to domestic bystanders was foreseeable, it would be difficult to conclude that failure to control asbestos dust was not a proximate cause of Joan Dube's death. Absent contrary authority in Maine law, if adherence to mandatory work-area regulations would have prevent-

The manufacturers' second argument makes this unnecessary.

## III. FAILURE TO WARN AS A DISCRETIONARY FUNCTION

■ The Federal Tort Claims Act provides that:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances....

28 U.S.C. § 2674. As discussed in Part II, *supra*, matters pertaining to a "discretionary function" are exempted from liability under the Act. 28 U.S.C. § 2680(a). Courts have long struggled to determine what conduct is properly deemed within the scope of government discretion under § 2680(a). Recent courts have approached the question with little more than the basic precept framing the issue; "whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). While *Varig Airlines* and *Berkovitz* have improved matters, we still share Judge Becker's appraisal: "Rather than a seamless web, however, we found the law in this area to be a patchwork quilt." *Blessing v. United States*, 447 F.Supp. 1160, 1167 (E.D.Pa.1978).

The trial court reasoned that *Varig Airlines* implicitly overruled a series of lower court decisions that had construed the discretionary function exception narrowly, resurrecting an earlier decision which had read the exception broadly. *See Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (4–3 decision).[9] The Supreme Court's unanimous decision in *Berkovitz*, however, handed down a few days after the trial court's disposition of the instant case, signals a narrower reading of the discretionary function exception.

After reviewing the language and legislative history of the FTCA, and its own case law, the Court in *Berkovitz* emphasized that: "The discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment." 108 S.Ct. at 1959. The government concedes that it made no such policy judgment in this case. The government never decided to forgo warning domestic bystanders; it simply failed (negligently, as determined by the trial court) to do so. "[C]onduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz*, 108 S.Ct. at 1958. *See also Dalehite*, 346 U.S. at 34, 73 S.Ct. at 967 (the exception protects "the discretion of the executive or administrator to act according to one's judgment of the best course"); *Arizona Maintenance Co. v. United States*, 864 F.2d 1497, 1503 (9th Cir.1989), ("Under *Berkovitz*, the key inquiry is not whether the government employee has a choice, but whether that choice is a policy judgment"). Because there was no exercise of judgment, the government appears to fail the threshold test of establishing that its conduct was protected from liability under the exception. *Contrast with Barnson v. United States*, 816 F.2d 549 (10th Cir.1987) (affirmative decision by federal official not to warn uranium miners of risks of radiation exposure covered by the discretionary function exception); *Begay v. United States*, 768 F.2d 1059 (9th Cir.1985) (same); *Ford v. American Motors Corp.*, 770 F.2d 465 (5th Cir.1985) (decision of postal service not to warn buyers of surplus vehicles of risk of rollovers was considered policy choice, and therefore within the discretionary function exception); *Myslakowski v. United States*, 806 F.2d 94 (6th Cir.1986) (same);

---

ed Joan Dube's exposure, then the Navy's failure to assure compliance as required by § 0103.3 would appear to be actionable.

**9.** The trial court may have been led astray by our analysis in *K.W. Thompson Tool Co., Inc. v. United States*, 836 F.2d 721, 726 (1st Cir.1988)

(describing *Dalehite* and *Varig Airlines* as "beacon cases," and prematurely proclaiming the demise of *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), which narrowed *Dalehite's* holding).

*Shirey v. United States,* 582 F.Supp. 1251, 1257–62 (D.S.C.1984) (same).

Of course, the Navy did make an affirmative choice to own and operate a shipyard, and to use asbestos on its ships. In its seminal *Dalehite* decision, the Supreme Court held that a high level policy decision to institute a program of producing and exporting fertilizer made from ammonium nitrate, formerly used for production of explosives, insulated the actions of lower level officials in carrying out the plan. 346 U.S. at 35–36, 73 S.Ct. at 967–68. But unlike the situation in *Dalehite,* the Navy's decision to use asbestos in its ships cannot shield it from liability based on its failure of care once it learned of the risk to domestic bystanders. While its language is sweeping, the holding in *Dalehite* turns on the existence of detailed plans and specifications laid out by policymaking officials. "The acts found to have been negligent were thus performed under the direction of a plan developed at a high level under a direct delegation of plan-making authority from the apex of the Executive Department." *Id.* at 39–40, 73 S.Ct. at 969–70. These officials planned, approved, and implemented the fertilizer program on notice of the inherent risks. *See id.* at 38–39, 46, 73 S.Ct. at 969–70, 973. That these officials consciously limited, in furtherance of the program, the extent to which safety precautions were researched and implemented was reinforced by the urgency of the government's efforts to rehabilitate war-torn Europe:

> The Supreme Court pointed out that the decision to manufacture the fertilizer, in order to feed the people in the vanquished United States-occupied countries in the aftermath of World War II and thus lessen the danger of internal unrest, was a matter of cabinet-level government policy. The possibility of dangerous explosions resulting from fertilizer made from ingredients formerly used for explosives was known and a decision was made to produce the fertilizer despite the risks.

*Shuman v. United States,* 765 F.2d 283, 291 (1st Cir.1985). In short, government officials acting within the scope of their authority assumed the risk (though not the liability) of the fertilizer program based on public policy considerations. Nothing in the record before us or in the government's arguments demonstrates a similar deliberate acceptance of risk in the use and regulation of asbestos in Navy ships. While the Navy became charged with knowledge of the risk to domestic bystanders in 1964, it concedes it never considered whether those risks justified a warning. At a minimum, the regulations discussed in Part II, *supra,* suggest a general Navy policy favoring warnings of known dangers.

The trial court deemed the discretionary function exception applicable because the adoption of a policy of warning domestic bystanders was "susceptible of discretion." But the cases relied upon by the trial court in reaching this conclusion are distinguishable from the present case in one important respect. In the cited cases, plaintiffs claimed that the government decisionmaker failed to take into account important considerations; the claims were that his decision was negligently made. So long as such decisions were authorized and policy-based, claims that they were poorly made fall within the exception. But in none of the cases relied upon by the trial court did the government actor fail, as in the instant case, to make an affirmative decision. *See U.S. Fidelity & Guar. Co. v. United States,* 837 F.2d 116 (3rd Cir.1988); *Allen v. United States,* 816 F.2d 1417 (10th Cir. 1987); *In re Consolidated United States Atmospheric Testing Litigation,* 820 F.2d 982 (9th Cir.1987). Each of these cases, and the trial court, quote *Myslakowski v. United States,* 806 F.2d 94 (6th Cir.1986). A portion of the quoted passage highlights the distinction we draw:

> Stated otherwise, even the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision *that is made.*
>
> Indeed, it is, in part, to provide immunity against liability for the consequences of negligent failure to consider the relevant, even critical, matters in dis-

cretionary decisionmaking that the statutory exception exists. If it were otherwise, *a judgment-based policy determination made at the highest levels,* to which all would concede that the statutory exception applies ... would result in no immunity if the decision could be shown *to have been made* without consideration of important, relevant factors, or was *a decision negligently reached.* *Id.* at 97–98 (emphasis added).

We recognize that the "susceptible of discretion" approach of the trial court is a valid approach in some circumstances. Where the activity is a traditional governmental function, it is possible that failure to exercise judgment will remain within the discretionary function exception. As the Court said in *Dalehite,*

> The legislative history indicates that while Congress desired to waive the Government's immunity from actions for injuries to person and property occasioned by the tortious conduct of its agents acting within the scope of business, it was not contemplated that the Government should be subject to liability arising from acts of a governmental nature or function. Section 2680(a) draws this distinction.

346 U.S. at 27–28, 73 S.Ct. at 963–64 (citations omitted). The exception covers: "Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency ... whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Excepting liability even for failure to exercise discretion or for abuse of discretion is consistent with the view that this limitation of liability is directed at areas of activity where the government is under no affirmative duty to act in the first instance, or where government actors employ broad policy discretion in pursuit of the public good. Categories of such conduct include the regulation of private conduct, *see Varig Airlines; Shuman,* 765 F.2d 283, and the protection of the public from natural or manmade dangers. *See, e.g., U.S. Fidelity & Guar. Co. v. United States,* 837 F.2d 116 (3rd Cir. 1988) (EPA discretion regarding manner of disposal of toxic chemicals); *Cisco v. United States,* 768 F.2d 788 (7th Cir.1985) (EPA discretion whether to warn households of danger from dioxin present in residential landfill); *Brown v. United States,* 790 F.2d 199 (1st Cir.1986) (discretion whether to repair weather buoy); *Chute v. United States,* 610 F.2d 7 (1st Cir.1979) (discretion regarding size of buoy marking sunken wreck); *Mitchell v. United States,* 787 F.2d 466 (9th Cir.1986) (discretionary FAA regulation regarding marking of power transmission ground wires). *See also Blessing,* 447 F.Supp. at 1172 n. 18 (citing cases). In such cases, the government's failure to consider whether to undertake a greater level of care generally remains within the exception.

But excepting a decision not to warn domestic bystanders in this case as susceptible of discretion loses sight of the structure of the FTCA. Under the FTCA, the government is liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. As owner and operator of an industrial shipyard, the Navy had a duty under Maine law to exercise due care towards those foreseeably harmed by its activities. Where, as here, the nature of the activity places the government under a common law duty of care, the clause of the discretionary function exception most likely to protect the government from liability excepts "Any claim based upon any act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation." 28 U.S.C. § 2680(a). The Navy points to no statute authorizing it to forgo warning domestic bystanders. *Cf. Varig Airlines,* 467 U.S. at 816, 104 S.Ct. at 2765–66 ("Congress specifically empowered the Secretary to establish and implement a mechanism for enforcing compliance with minimum safety standards according to her 'judgment of the best course,'" citing *Dalehite* 346 U.S. at 34, 73 S.Ct. at 967.); *Begay v. United States,* 768 F.2d 1059 (9th Cir.1985) (relying in part on statute authorizing Surgeon General to release test data "at such times and to such extent as [he] may determine to be

in the public interest.") Even if the government were somehow authorized to avoid common law duty of care requirements, the FTCA attaches liability under state standards to PNS, unless the failure to consider a policy can be reconciled with exercising "due care." When the government is operating in a capacity so highly analogous to private industry, we doubt that the "susceptible of discretion" analysis can protect an official's negligent failure to act without an affirmative exercise of policy judgment, or without an express statutory preservation of the scope of an agency's discretion.[10] *See McMichael v. United States,* 751 F.2d 303, 306 (8th Cir.1985) ("In this case, the Defense Department was pursuing a proprietary rather than a regulatory objective.... The Supreme Court's admonition [in *Varig Airlines*] to avoid judicial second-guessing of regulatory decisions is thus not wholly applicable....").[11]

This contrasts with the situation presented in *Smith v. Johns–Manville Corp.,* 795 F.2d 301 (3rd Cir.1986). In that case, the statute required the GSA to "[protect] the United States from avoidable loss" in the sale of surplus asbestos. 50 U.S.C. § 98b(e). This authorized the GSA to forgo warning labels that might otherwise be required under state law, and to sell surplus asbestos "as is," thereby requiring *purchasers* to assume the risk. Further, evidence adduced at trial clearly established that the decision not to place warning labels on packages of surplus asbestos was a deliberate policy choice.[12]

The difficulty with the "susceptible of discretion" approach used by the trial court is indicated by the Court's articulation in *Berkovitz* of the discretionary function standard: "The discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment." 108 S.Ct. at 1959. Without an actual decision to forgo protecting or warning domestic bystanders, it is difficult to determine whether even the Navy would consider such a decision a permissible or

---

**10.** Our consideration of the nature of the governmental activity in this case should not be read as an attempt to resurrect the "uniquely governmental functions" argument advanced by the United States as an absolute bar to liability in *Indian Towing* and rejected by the Supreme Court in that case. *See* 350 U.S. at 64–65, 76 S.Ct. at 124–25. Rather, our focus is on the much more narrow consideration of when the *failure to consider* whether to adopt a policy protective of a plaintiff in an FTCA action can be considered discretionary.

When a plaintiff stands merely as a potential beneficiary of the government's regulatory authority or other discretionary activity, failure to consider is often "discretionary." But where, as here, the plaintiff claims she is owed a common law duty of care through analogy of governmental conduct to that of a private actor, failure to consider is not likely to be discretionary unless so provided by statute.

**11.** The Navy does not appear to argue that its operation of the shipyard should be deemed a governmental function as a military operation. Indeed, Admiral Westfall, describing his position as commander of PNS, testified:

It was very much like being the president of a major industrial activity. Our naval shipyards are run like a private sector, they're financed that way. You don't get money from Washington, you have to earn it. You can literally go broke. The difference in the profit is supposed to be zero.

App. at 691a.

Rather, the government regards its ownership of PNS as irrelevant to the discretionary function analysis. We view the government's ownership as relevant insofar as it removes this case from the category of government acting in its role as regulator of the conduct of private individuals, a class of conduct the Supreme Court has indicated is plainly within the discretionary function exception. *See Varig Airlines,* 467 U.S. at 813–14, 819–20, 104 S.Ct. at 2764–65, 2767–68. In short, the government as owner and operator of a shipyard should be held to the same standards as private shipyard owners, as in *Shuman v. United States,* 765 F.2d 283, and *In re All Maine Asbestos Litigation (BIW Cases),* 655 F.Supp. 1169 (D.Me.1987).

**12.** Though the district court in *Johns–Manville* found that the government did not affirmatively make a policy decision concerning warning labels, the court of appeals clearly rejected that view. 795 F.2d at 307 (framing issue as "whether GSA's decision not to label" fell within exception). The GSA official responsible for preparing and approving bid invitations averred that the invitations "required that asbestos be sold in the original packaging, with the same markings and in the same condition as it was acquired and stored" because "[t]o test, warranty, repackage, or relabel such materials at the time of disposal ... would have resulted in avoidable cost to the government."). *See also In re All Maine Asbestos Litigation,* 581 F.Supp. 963, 971 (D. Maine 1984).

impermissible exercise of policy judgment. Application of the exception where the agency fails to make a judgment threatens to turn the mandate of *Varig Airlines* on its head. As the Court there stated:

Judicial intervention in such decision making through private tort suits would require the courts to "second-guess" the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policy-making that the discretionary function exception was designed to prevent.

467 U.S. at 820, 104 S.Ct. at 2768. But where there is no policy judgment, courts would be "second-guessing" by implying one.

Beyond the lack of a Navy policy judgment, the nature of a putative policy not to warn domestic bystanders is highly speculative. We do not need to enter the policy-making arena to observe that it is difficult to imagine the Navy justifying a decision not to issue a simple warning to domestic bystanders of such potentially devastating danger, based on economic or other policy grounds. *Compare Shuman*, 765 F.2d at 288 (noting trial court's finding that "adoption of conventional safety standards would not have involved significant costs or significant delay to the war effort"), *with Johns–Manville*, 795 F.2d 301, 306 n. 7 (recounting government official's assertion of the "substantial potential for great economic loss to the United States upon disposition" of large quantities of surplus asbestos, and his description of the substantial and avoidable costs of repackaging or relabeling same for sale to commercial buyers "better qualified than our own storage personnel to properly transport, unpackage, handle and use the material in their manufacturing processes").

Our decision that the government is not excepted from liability under the FTCA for its breach of a state law duty to warn finds support in a host of decisions. *See, e.g., Angel v. United States*, 775 F.2d 132, 145 (6th Cir.1985) (failure to warn of danger of high voltage wire); *Aretz v. United States*, 604 F.2d 417 (5th Cir.1979) (failure to label substance as explosive); *Smith v. United States*, 546 F.2d 872 (10th Cir.1976) (citing cases) (failure as landowner to post warning signs in national park); *Stephens v. United States*, 472 F.Supp. 998, 1009 (C.D. Ill.1979) (same); *United States v. White*, 211 F.2d 79 (9th Cir.1954) (failure of government as land owner to warn business invitee of danger from unexploded projectiles); *Pierce v. United States*, 142 F.Supp. 721 (E.D.Tenn.1955), *aff'd*, 235 F.2d 466 (6th Cir.1956) (failure to warn lineman of dangerous conditions in government-owned transmission facility); Annotation, *Liability of United States for Failure to Warn of Danger or Hazard Resulting from Governmental Act or Omission as Affected by "Discretionary Function or Duty" Exception to Federal Tort Claims Act*, 65 A.L.R.Fed. 358 (1983). *See also Henderson v. United States*, 784 F.2d 942, 943 n. 2 (9th Cir.1986) (safety decisions at government facility are operational in nature, and therefore not within the discretionary function exception); *Merklin v. United States*, 788 F.2d 172, 177 (3rd Cir. 1986) (duty of government as supplier of dangerous chattel to warn those who will foreseeably come in contact with the product of its inherent risks not within the exception). Perhaps the district court's analysis in *Pierce*, by analogy, best summarizes our conclusion in this case:

The initial decision to construct [electrical substations] and the decision to reactivate surely involved an exercise of discretion for which no liability attaches. Also the decision to undertake the reactivation work at the particular time it was commenced and similar decision going to the over-all success of the project would necessarily involve decisions at high level in which the exercise of discretion in the choice of various alternative courses of action would be involved. Even the decision to construct electrical substations and bring high-voltage power onto the premises would constitute discretionary functions. However, the Court is unable to go further and say that once the discretion was exercised to construct substations, any discretion was involved in the subsequent ... failure to warn work-

men of its dangerous condition when the rehabilitation program was commenced....

142 F.Supp. at 731.

## IV. CONCLUSION

We conclude that the Navy's failure to warn domestic bystanders of the risks associated with exposure to asbestos dust is not "of the nature and quality that Congress intended to shield from tort liability." *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764. We therefore reverse the trial court's judgment for the United States, and remand for entry of judgment in accordance with the trial court's previous findings on negligence, causation, and allocation of liability.