891 F.2d 31
 58 USLW 2337
 In re JOINT EASTERN AND SOUTHERN DISTRICTS ASBESTOS LITIGATION.
In the Matter of Sally ROBINSON, as Personal Representative
of the Estate and Beneficiaries of Edward
Robinson, Deceased, Plaintiff-Appellant,
v.
UNITED STATES of America, Nicolet, Inc., Individually and as
Successor in Interest to Keasby & Mattison Company,
Certainteed Corporation, Individually and as Successor in
Interest to Keasby & Mattison Company, Keene Corporation,
Individually and as Successor in Interest to Ehret Magnesia
Manufacturing Co., the Celotex Corporation, Individually and
Successor in Interest to Philip Carey Manufacturing Company,
Raymark Industries, Inc., Individually and as Successor in
Interest to Raybestos-Manhattan, Inc., Armstrong Industries,
Inc., Individually and as Successor in Interest to
Eagle-Picher Company, Defendants,
United States of America, Defendant-Appellee.
 No. 1547, Docket 89-6109.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 16, 1989.
Decided Nov. 29, 1989.
 
 George Kaufmann, Washington, D.C. (Howard N. Feldman, Laura B. Feigin, Dickstein, Shapiro & Morin, Washington, D.C., of counsel), for plaintiff-appellant.
 Gregory C. Sisk, Washington, D.C. (Robert S. Greenspan, U.S. Dept. of Justice, Washington, D.C., Stuart E. Schiffer, Acting Asst. Atty. Gen., of counsel), for defendant-appellee.
 Before MINER and ALTIMARI, Circuit Judges, and KELLEHER, District judge.*
 ALTIMARI, Circuit Judge:
 In this case, we consider the court's jurisdiction to entertain a personal injury claim against the United States for damages allegedly caused by exposure to asbestos on board ships of the United States' merchant fleet during World War II. Plaintiff-appellant Sally Robinson, as representative of the estate of her late husband Edward Robinson, appeals from a judgment of the United States District Court for the Eastern District of New York (Sifton, J.) which granted the United States' motion under Fed.R.Civ.P. 12(b)(1) to dismiss for lack of subject matter jurisdiction.
 
 
 1
 Edward Robinson had been employed on merchant ships operated by the United States through the War Shipping Administration during World War II. Plaintiff asserted wrongful death claims against a number of asbestos companies and against the United States under the Suits in Admiralty Act, 46 U.S.C.App. § 741 et seq. ("SAA"), and the War Shipping Administration Clarification Act of 1943, 50 U.S.C.App. § 1291 ("Clarification Act"). The district court determined that the United States' waiver of sovereign immunity embodied in the SAA and the Clarification Act is limited by the discretionary function exception. The court further found that the complained of governmental conduct was discretionary within the meaning of the exception. Accordingly, the district court granted the government's motion to dismiss and directed entry of final judgment pursuant to Fed.R.Civ.P. 54(b) as to all claims against the United States. Suit continues, however, against the asbestos companies.
 
 
 2
 On this appeal, plaintiff contends that the district court improperly implied the discretionary function exception to the SAA and the Clarification Act. Alternatively, she argues that the government conduct here at issue is not covered by the exception. For the reasons that follow, we affirm the judgment of the district court.
 
 BACKGROUND
 
 3
 "[I]n order to assure the most effective utilization of the shipping of the United States for the successful prosecution of [World War II]," President Franklin D. Roosevelt established the War Shipping Administration ("WSA") by executive order on February 7, 1942. Exec. Order No. 9054, 3 C.F.R. 1086 (1938-43), reprinted in 1942 U.S.Code Cong.Serv. 154. The WSA was empowered to "[c]ontrol the operation, purchase, charter, requisition, and use of all ocean vessels under the flag or control of the United States," with certain exceptions not relevant here. Id. at 1087. As a result, "substantially our entire merchant marine became part of a single vast shipping pool, said to have been the largest in history." Hust v. Moore-McCormack Lines, Inc., 328 U.S. 707, 709, 66 S.Ct. 1218, 1219, 90 L.Ed. 1534 (1946), overruled, Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 794, 69 S.Ct. 1317, 1323, 93 L.Ed. 1692 (1949).
 
 
 4
 The WSA obtained ships either through new construction or by transfer of existing vessels from private shipping interests. Hust, 328 U.S. at 710, 66 S.Ct. at 1219. The transfer of vessels was effected by use of general agency agreements. Pursuant to these agreements, the vessels continued to be operated by their original owners, Gordon v. Lykes Bros. S.S. Co., 835 F.2d 96, 97 (5th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988), "subject to the directions, orders, and regulations of the [WSA]." Note, Remedies of Merchant Seamen Injured on Government Owned Vessels, 55 Yale L.J. 584, 588 (1946).
 
 
 5
 Since the number of existing vessels was insufficient to satisfy the wartime needs of the United States, the majority of the WSA controlled fleet was obtained through new construction. See Report of the War Shipping Administrator to the President, The United States Merchant Marine at War 33 (Jan. 15, 1946). The United States' wartime shipbuilding effort was a "race between ship construction and sinkings by the enemy." Id. Thus, that "[e]fficient ship construction and operation was a very high priority of the United States government during World War II," Gordon, 835 F.2d at 97, is a vast understatement.
 
 
 6
 In response to the national emergency, the United States Maritime Commission Division of Emergency Ship Construction (the "Commission") was ordered to "get results fast, even at the sacrifice of some of the painstaking procedures which were part of the usual practice." F. Lane, Ships for Victory: A History of Shipbuilding Under the U.S. Maritime Commission in World War II 78 (1951). To achieve the desired efficiency, the Commission utilized nationwide standardization of design and materials. Id. at 72. Standardized use of readily available materials ensured a steady flow from numerous suppliers to the many shipyards. See id. Moreover, as voiced by the Commission's director of building operations, the Commission took a dim view of design improvements: " 'they are not only not desired, but are not to be accepted, unless it can be shown that they are essential to acceptable performance, and at the same time that they can be incorporated without prejudice to prompt procurement.' " Id. at 578.
 
 
 7
 As a consequence of the winning effort in the race between ship construction and sinkings, asbestos was used heavily in the construction of World War II merchant ships. See Gordon, 835 F.2d at 97.
 
 DISCUSSION
 
 8
 A. Applicability of the Discretionary Function Exception.
 
 
 9
 Robinson contends that the district court improperly implied the discretionary function exception to the SAA and the Clarification Act. Specifically, she contends that the waiver of sovereign immunity expressed in those acts subjects the United States to liability on the same basis as private vessel owners and the court may not imply any exception not applicable in suits against private defendants. We disagree.
 
 
 10
 1. The Suits in Admiralty Act.
 
 
 11
 The SAA was one of "a series of statutes directed generally at affording private vessel owners an adequate and efficient remedy for damages arising from negligent operation of ships owned by the United States." Canadian Aviator, Ltd. v. United States, 324 U.S. 215, 218, 65 S.Ct. 639, 641, 89 L.Ed. 901 (1945). Prior to 1916, persons injured by the negligent operation of vessels owned or operated by the United States could not recover against the United States due to the United States' sovereign immunity. In contrast, the United States could bring an action against private shipowners. Congress addressed this inequity by enacting the Shipping Act of 1916, ch. 451, 39 Stat. 728 (1916); see Canadian Aviator, 324 U.S. at 218-19, 65 S.Ct. at 641-42. The Shipping Act of 1916 subjected the United States' merchant fleet to "all laws, regulations, and liabilities governing merchant vessels." 39 Stat. 730-31.
 
 
 12
 The Shipping Act of 1916 had broader reach than Congress intended. Application of the Act led to the seizure of a ship belonging to the United States incident to an admiralty proceeding in rem. See The Lake Monroe, 250 U.S. 246, 248, 39 S.Ct. 460, 461, 63 L.Ed. 962 (1919). This occurrence embarrassed Congress and provided the impetus for the adoption of the SAA. See Canadian Aviator, 324 U.S. at 219, 65 S.Ct. at 641. The SAA declared that no vessel owned by or in the possession of the United States shall be subject to arrest or seizure by judicial process. Ch. 95, § 1 et seq., 41 Stat. 525 (1920). The SAA further stated that "in cases where if such vessel were privately owned or operated, ... a proceeding in admiralty could be maintained," a libel in personam for damages could be filed against the United States "provided that such vessel is employed as a merchant vessel or is a tugboat." Id. at § 2, 525-26.
 
 
 13
 The SAA contains no express exception for discretionary functions. In contrast, Congress expressly included the discretionary function exception in the Federal Tort Claims Act, 28 U.S.C. § 2680(a) ("FTCA"), in order "to 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988) (quoting United States v. Varig Airlines, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)).
 
 
 14
 The inclusion of such an exception in the FTCA, on the one hand, and the omission of an express exception from the SAA, on the other, does not compel the conclusion that the SAA is not subject to the discretionary function exception. The exception was drafted merely as a "clarifying amendment" to the FTCA, Dalehite v. United States, 346 U.S. 15, 26, 73 S.Ct. 956, 963, 97 L.Ed. 1427 (1953), since Congress "believed that claims of the kind embraced by the discretionary function exception would have been exempted from the waiver of sovereign immunity by judicial construction." Varig Airlines, 467 U.S. at 810, 104 S.Ct. at 2762. This belief was well founded.
 
 
 15
 Virtually every circuit which has addressed the issue has found the discretionary function exception applicable to the SAA. See Gordon, 835 F.2d at 98-99; Wiggins v. United States, 799 F.2d 962, 965-66 (5th Cir.1986); Gemp v. United States, 684 F.2d 404, 408 (6th Cir.1982); Canadian Transport Co. v. United States, 663 F.2d 1081, 1085-87 (D.C.Cir.1980); Bearce v. United States, 614 F.2d 556, 559-60 (7th Cir.), cert. denied, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980); Gercey v. United States, 540 F.2d 536, 539 (1st Cir.1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977); Williams v. United States, 581 F.Supp. 847, 852 (S.D.Ga.1983), aff'd on opinion below, 747 F.2d 700 (11th Cir.1984). Only the Fourth Circuit has failed to limit the SAA by the discretionary function exception. See Lane v. United States, 529 F.2d 175, 179 (4th Cir.1975). Subsequently, however, the Fourth Circuit appeared to depart from its stance, see Faust v. South Carolina State Highway Dep't, 721 F.2d 934, 938-39 (4th Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984), so that "the Fourth Circuit is no longer on record as having held unassailably that no discretionary function exception is implied in the SAA." Wiggins, 799 F.2d at 965.
 
 
 16
 The wellspring of the discretionary function exception is the doctrine of separation of powers. Simply stated, principles of separation of powers mandate that the judiciary refrain from deciding questions consigned to the concurrent branches of the government. Caban v. United States, 671 F.2d 1230, 1233 (2d Cir.1982). If substantial constitutional issues are not implicated, the wisdom of decisions made by the executive and legislative branches are not subject to judicial review. See In re Agent Orange Product Liability Litigation, 818 F.2d 194, 198 (2d Cir.1987).
 
 
 17
 The doctrine of separation of powers is "a doctrine to which the courts must adhere even in the absence of an explicit statutory command." Canadian Transport, 663 F.2d at 1086. Were we to find the discretionary function exception not to be applicable to the SAA, we would subject " 'all administrative and legislative decisions concerning the public interest in maritime matters ... to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries.' " Bearce, 614 F.2d at 559 (quoting Gercey, 540 F.2d at 539). Such an outcome is intolerable under our constitutional system of separation of powers. Therefore, in accord with the great weight of authority, we find the SAA to be subject to the discretionary function exception. This result is compelled by our steadfast refusal to assume powers that are vested in the concurrent branches.
 
 
 18
 2. The Clarification Act.
 
 
 19
 The Clarification Act provides, inter alia, that seamen "employed on United States or foreign flag vessels as employees of the United States through the War Shipping Administration shall ... have all of the rights, benefits, exemptions, privileges, and liabilities, under law applicable to citizens of the United States employed as seamen on privately owned and operated American vessels." 50 U.S.C.App. § 1291(a).
 
 
 20
 As previously discussed, Congress had enacted the SAA to provide private parties with a remedy for damages arising from the operation of ships owned by the United States. Following the WSA's assumption of control of the merchant fleet, however, it was often unclear whether an action would lie under the SAA.
 
 
 21
 Operating conditions during World War II made it difficult to determine whether a particular vessel was a "merchant" ship or a "public vessel." S.Rep. No. 62, 78th Cong., 1st Sess. 5-6 (1943) ("Senate Report" ). The significance of the distinction was that merchant ships fell within the coverage of the SAA, while public vessels were excluded. As noted in the legislative history of the Clarification Act:
 
 
 22
 [V]ital differences in ... rights are made to depend on whether the seaman happens to be employed aboard a vessel time-chartered to the [WSA] or owned by or bareboat-chartered to the [WSA]. Since seamen constantly change from one vessel to another, their rights ... also constantly change, depending upon the relationship of the [WSA] to the vessel. This fluctuation and lack of uniformity of rights leads to dependency of vital rights upon chance with a result of confusion and inequities. The [Clarification Act] is designed to remove this confusion and these inequities.
 
 
 23
 Id. (emphasis added). Thus, what the Clarification Act clarified was that seamen aboard WSA ships, "though technically Government employees, [could] have their rights determined" under the SAA, H.Rep. No. 107, 78th Cong., 1st Sess. 22 (1943), "regardless of the nature of the vessel on which [they served]." Senate Report at 14.
 
 
 24
 Since the Clarification Act employs the SAA to make its authorized claims enforceable, Gordon, 835 F.2d at 99, it would seem to follow that any exception applicable to the SAA must likewise be applicable to claims brought under the Clarification Act. Even if this is not the case, however, the court remains anchored by the doctrine of separation of powers regardless of whether a claim is launched pursuant to the SAA or the Clarification Act. Accordingly, we find the Clarification Act to be subject to the discretionary function exception. See id.
 
 
 25
 B. Application of the Discretionary Function Exception.
 
 
 26
 Robinson contends that the United States' operation of ships upon which asbestos was present was not discretionary within the meaning of the discretionary function exception. In addition, she asserts that the exception does not shield the United States from liability arising from the failure to warn of dangers posed by asbestos on board the World War II merchant fleet. We disagree.
 
 
 27
 Although the precise contours of the discretionary function exception are hard to define, see Varig Airlines, 467 U.S. at 813, 104 S.Ct. at 2764, it is clear that the exception "insulates the Government from liability if the action challenged ... involves the permissible exercise of policy judgment." Berkovitz, 108 S.Ct. at 1959. To determine whether particular conduct falls within the exception, we employ the two-step analysis enunciated in Berkovitz. Id. at 1958-59; see also Piechowicz v. United States, 885 F.2d 1207, 1211-12 (4th Cir.1989); Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1025 (9th Cir.1989). First, we consider whether the conduct is the product of choice, Berkovitz, 108 S.Ct. at 1958, and if so, whether the choice involves considerations of public policy. Id. at 1959. An action "cannot be discretionary unless it involves an element of judgment or choice." Id. at 1958 (citing Dalehite, 346 U.S. at 34, 73 S.Ct. at 967). Thus, conduct is not the product of choice and "the discretionary function exception [does] not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Id. Likewise, the exception does not apply where no public policy is implicated because the exception is designed to shield only " 'legislative and administrative decisions grounded in social, economic, and political policy.' " Id. at 1959 (quoting Varig Airlines, 467 U.S. at 814, 104 S.Ct. at 2765).
 
 
 28
 There can be no doubt that each of the actions challenged by plaintiff were matters of choice for President Roosevelt and his administration. During the war, the government was faced with a desperate need to place merchant ships upon the seas. The decisions to operate existing ships, which contained asbestos, and to employ existing designs and materials, including asbestos, in the construction of new ships were not prescribed by any federal statute, regulation, or policy, save for the ultimate policy of defending the nation.
 
 
 29
 We are unpersuaded by Robinson's assertion that the government's decision to operate ships with asbestos on board was impermissible because the government had an absolute duty under the common law to provide "seaworthy" vessels. Under Berkovitz, a matter is removed from the realm of permissible choice by "federal statute, regulation, or policy." Id. at 1958 (emphasis added). The fact that the challenged actions were matters of choice "cannot be overcome by clothing the discretionary act[s] in the maritime uniform of a breach of a duty to provide a seaworthy vessel." Gordon, 835 F.2d at 100. We are unwilling to declare that during a world war, when ships were being sunk by the enemy as fast as they could be constructed, it was impermissible for the government to choose to deploy ships in less than "seaworthy" condition.
 
 
 30
 We need spend little time discussing whether the contested choices involved considerations of public policy. It is difficult to imagine a clearer example of a decision grounded in social, economic, and political policy than the choice of how to prosecute a world war.
 
 
 31
 Finally, we do not accept plaintiff's contention that the discretionary function exception does not cover the government's failure to warn of the hazards of asbestos on board the merchant fleet. Relying on Dube v. Pittsburgh Corning, 870 F.2d 790 (1st Cir.1989), Robinson asserts that the exception applies only to policy judgments which were actually made, and that the government made no such judgments with respect to the issuance of warnings.
 
 
 32
 Dube concerned claims on behalf of a woman whose death was attributed to asbestos carried home on the work clothes of her father, a Navy shipyard worker. The Navy had become aware of the risks posed to domestic bystanders by asbestos which was carried home, but conceded that "it never considered whether those risks justified a warning." Id. at 797. Dube reasoned that in situations where "the government is acting in a capacity so highly analogous to private industry, ... an official's negligent failure to act without an affirmative exercise of policy judgment" is not shielded by the discretionary function exception. Id. at 799. Dube acknowledged, however, that "[w]here the activity is a traditional governmental function, it is possible that failure to exercise judgment will remain within the discretionary function exception." Id. at 798.
 
 
 33
 We believe that it is unimportant whether the government actually balanced economic, social, and political concerns in reaching its decision. United States Fidelity & Guar. Co. v. United States, 837 F.2d 116, 120 (3d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988); see Kennewick, 880 F.2d at 1028; Allen v. United States, 816 F.2d 1417, 1422 n. 5 (10th Cir.1987), cert. denied, 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 647 (1984); Myslakowski v. United States, 806 F.2d 94, 97-98 (6th Cir.1986), cert. denied, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987). The discretionary function exception applies " '[w]here there is room for policy judgment.' " Berkovitz, 108 S.Ct. at 1959 (quoting Dalehite, 346 U.S. at 36, 73 S.Ct. at 968). Thus, "the relevant question is not whether an explicit balancing is proved, but whether the decision is susceptible to policy analysis." United States Fidelity & Guar. Co., 837 F.2d at 121.
 
 
 34
 Dube recognized "that the 'susceptible of discretion' approach ... is a valid approach in some circumstances," particularly "where government actors employ broad policy discretion in pursuit of the public good." 870 F.2d at 798. We have no doubt that the record before us presents such circumstances. Accordingly, we find that the government's failure to adopt a safety program to warn of asbestos-related dangers on board ships in the midst of World War II is covered by the discretionary function exception.
 
 CONCLUSION
 
 35
 For all of the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 *
 Honorable Robert J. Kelleher, Senior District Judge of the United States District Court for the Central District of California, sitting by designation