PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

RICHARD LEE SMITH, Individually
and as Personal Representative of
the Estate of Richard Hadaway
Smith, Deceased; NANCY G. SMITH,
Individually and as Personal
Representative of the Estate of
Richard Hadaway Smith, Deceased,
                    *Plaintiffs-Appellees,*

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY,
                    *Defendant-Appellant.*

No. 01-1345

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-99-2187-AW)

Argued: November 2, 2001

Decided: May 10, 2002

Before MICHAEL, KING, and GREGORY, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the
opinion, in which Judge Gregory joined. Judge Michael wrote an
opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** David R. Keyser, Assistant General Counsel, WASH-
INGTON METROPOLITAN AREA TRANSIT AUTHORITY,

Washington, D.C., for Appellant. Jack Arthur Gold, KARP, FROSH, LAPIDUS, WIGODSKY & NORWIND, P.A., Washington, D.C., for Appellees. **ON BRIEF:** Cheryl C. Burke, General Counsel, Robert J. Kniaz, Deputy General Counsel, Gerard J. Stief, Associate General Counsel, WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Washington, D.C., for Appellant. Lawrence S. Lapidus, KARP, FROSH, LAPIDUS, WIGODSKY & NORWIND, P.A., Washington, D.C., for Appellees.

---

## OPINION

KING, Circuit Judge:

In July 1999, the parents of Richard Hadaway Smith, individually and as representatives of his estate, initiated this proceeding against the Washington Metropolitan Area Transit Authority (the "METRO") in the District of Maryland, seeking damages for the death of their son. In response, the METRO asserted governmental immunity and, upon the court's partial denial of its immunity claim, noticed an interlocutory appeal. Because the METRO is entitled to a broader grant of immunity than that accorded it by the district court, we vacate and remand.

### I.

### A.

On the afternoon of July 20, 1998, at the METRO's Bethesda station in Maryland, Smith climbed an escalator which was being utilized as a stairway, i.e., a "stationary walker."[1] At the top of the escalator, Smith suffered a fatal heart attack. The METRO had decided to utilize the escalator as a stationary walker on that occasion because the two other escalators at its Bethesda station were inoperative.

---

[1]A "stationary walker" is an escalator at a METRO station that has been braked and stopped in a stationary position and has been placed in use as a stairway. Patrons of the METRO are then permitted to walk up or down the stationary walker.

Public access to the Bethesda station is normally provided by three escalators and an elevator. By design, each of the three escalators is capable of being operated either up or down, and the direction of each escalator can be altered by METRO officials on the basis of need. On July 8, 1998, twelve days before Smith's tragic death, one of the escalators at the Bethesda station ("Escalator Two") had failed an inspection by Maryland safety inspectors. A safety inspector thereafter refused to allow the METRO to utilize Escalator Two as a stationary walker, and it was inoperative on July 20, 1998. On the night of July 19, 1998, while the Bethesda station was closed, a second escalator ("Escalator Three") was being subjected to routine maintenance when METRO mechanics discovered a problem necessitating its repair. This problem rendered Escalator Three potentially unsafe for the METRO to operate, and on July 20, 1998, Escalator Three was in a state of disassembly awaiting a replacement part.

As a result of the inoperative status of Escalators Two and Three, the METRO made the decision to utilize its sole operating escalator ("Escalator One") as a stationary walker, thus enabling its patrons to both enter and exit the Bethesda station by a means other than the single elevator. Smith's fatal heart attack occurred at approximately 3:15 p.m. on July 20, 1998.[2]

### B.

This proceeding was initially filed in the district court on July 22, 1999, alleging that, due to its negligence, the METRO is liable for Smith's death. An amended complaint, filed August 15, 2000, consisted of two counts, each premised on the same allegation of negligence: one for wrongful death, made on behalf of Smith's parents,

---

[2]At the time of his death, Smith was a 37-year-old obese male. Although apparently unaware of his condition, he suffered from severe coronary atherosclerosis, with a 70% to 90% blockage of the arteries surrounding his heart. In 1994, Smith was diagnosed with high cholesterol, but he had rejected his doctor's recommendations for ameliorating this condition.

plus a second count under the Maryland survival statute, asserted on behalf of Smith's estate.[3]

In response to this allegation, the METRO sought summary judgment on the basis of multiple contentions, including the immunity claim now on appeal. The development of the case in district court revealed that Smith's negligence allegation concerning the Bethesda station embodied five theories, as follows:

1.   The METRO had negligently braked Escalator One for use as a stationary walker;

2.   The METRO had negligently left Escalator Three disassembled pending repair;

3.   The METRO had negligently failed to warn its Bethesda patrons of the conditions on July 20, 1998;

4.   The METRO's signage and illumination (the alleged "design defects") failed to comply with the requirements of the ANSI Code;[4]

5.   The METRO had negligently failed to repair and maintain Escalators Two and Three.

Upon its consideration of the METRO's summary judgment request, and the assertions and related submissions of the parties on the legal and factual issues relating thereto, the district court declined to resolve the case fully in favor of the METRO. *Smith v. Washington Metro. Area Transit Auth.*, 133 F. Supp. 2d 395 (D. Md. 2001) (the "Opinion"). It concluded, inter alia, that the METRO's alleged failure

---

[3]We refer in this opinion to the plaintiffs collectively, including the decedent, as "Smith."

[4]The American National Standards Institute (ANSI) promulgates a Safety Code for Elevators and Escalators. The ANSI Code is developed by the American Society of Mechanical Engineers, and it is published after approval by ANSI as an American National Standard. Maryland law requires that all escalators be maintained in accordance with the ANSI Code. Md. Ann. Code art. 89, § 49B(d) (1998 Repl. Vol.).

to repair and maintain its escalators was not within its immunity protection. The court determined, however, that the METRO was entitled to immunity for the design of signage and illumination at its Bethesda station, which was alleged to violate the ANSI Code. The court also ruled in favor of the METRO on what it called the "alleged statutory violations" because Smith had failed to forecast sufficient evidence to warrant the conclusion that violations of the ANSI Code had proximately caused his death. The METRO has appealed the court's decision declining to fully recognize its immunity claim in this case.

## C.

It is settled that the denial of an immunity claim by a district court constitutes an appealable interlocutory decision. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *KiSKA Constr. Corp. v. WMATA*, 167 F.3d 608, 610-11 (D.C. Cir. 1999). In this case, the court partially rejected the METRO's immunity claim, and "[w]hen the 'defendant raises and the district court rejects immunity as a defense, the defendant enjoys the right of immediate appeal.'" *KiSKA*, 167 F.3d at 610 (quoting *Rendall-Speranza v. Nassim*, 107 F.3d 913, 916 (D.C. Cir. 1997)).

To the extent the METRO's complained-of actions fall within its cloak of immunity, we lack subject matter jurisdiction over such claims. *See, e.g.*, *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001). In 1995, we observed that an assertion of governmental immunity is properly addressed under the provisions of Rule 12(b)(1) of the Federal Rules of Civil Procedure.[5] *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). As we noted, if the governmental entity challenges jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of persuasion, and the court is free to consider exhibits outside the pleadings "to resolve factual disputes concerning jurisdiction." *Id.*

---

[5]Pursuant to Rule 12(b)(1), the defense of "lack of jurisdiction over the subject matter" may be asserted by motion at the option of the pleader, rather than requiring it to be asserted in the responsive pleading. Only a motion under Rule 12(b)(6) will be treated as one for summary judgment, and then only if "matters outside the pleading are presented to and not excluded by the court."

In this instance, the district court partially denied the METRO's immunity claim, thereby deciding that it possessed subject matter jurisdiction over Smith's causes of action. On interlocutory review of such an immunity denial, we do not decide whether a plaintiff can prove his claim at trial. Rather, we must examine whether any material jurisdictional fact is in dispute, and if not, whether the governmental entity "is entitled to prevail as a matter of law" due to our lack of jurisdiction. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 769 (4th Cir. 1991).

## II.

### A.

In order to properly assess the METRO's claim of immunity, it is necessary to first understand certain legal principles governing the METRO's operations. First of all, the METRO Compact (the "Compact") was executed in 1966 by the State of Maryland, the Commonwealth of Virginia, and the District of Columbia, creating an independent entity to operate a mass transit system in and about the District of Columbia. Congress specifically consented to the Compact, and any legal issues relating to its interpretation are federal questions. *Cuyler v. Adams*, 449 U.S. 433, 438 (1981); *Morris v. WMATA*, 781 F.2d 218, 220 (D.C. Cir. 1986).

As a general proposition, multistate entities such as the METRO are not accorded governmental immunity absent some "good reason to believe" that immunity was intended to be conferred upon them. *Morris*, 781 F.2d at 224 (quoting *Lake Country Estates v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979)). The Compact, however, evinces the clear intent of its signatories to effect such a conferral. *Morris*, 781 F.2d at 220. Pursuant to its Section 80, the METRO has waived immunity in certain circumstances, i.e., when it is engaged in proprietary functions, while specifically preserving its immunity for "torts occurring in the performance of a governmental function."[6]

---

[6]The parties to the Compact — Maryland, Virginia, and the District of Columbia — have each adopted Section 80, providing that:

  The Authority shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed

### B.

As a threshold question, we must examine the legal framework to be utilized in assessing the immunity issue. While we have previously applied the traditional "governmental/proprietary" distinction to the METRO, we have also recognized the difficulty in determining when a particular function is a proprietary one.[7] *Martin v. WMATA*, 667 F.2d 435, 436 (4th Cir. 1981). In analyzing this distinction, the Court of Appeals for the District of Columbia has utilized the "discretionary/ministerial" dichotomy employed by the Federal Tort Claims Act ("FTCA").[8] *See, e.g.*, *Sanders v. WMATA*, 819 F.2d 1151, 1155 (D.C. Cir. 1987).

Although these two tests — "governmental/proprietary" and "discretionary/ministerial" — are not coterminous, the discretionary acts

---

> in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but *shall not be liable for any torts occurring in the performance of a governmental function.*

Md. Code Ann. Trans. § 10-204(80) (2000); Va. Code Ann. § 56-529, 530 (2001); D.C. Code Ann. § 9-1107.01 (2001) (emphasis added).

[7] The Supreme Court has determined, in a number of contexts, that the previously recognized "distinction between 'governmental' and 'proprietary' functions was untenable and must be abandoned." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 542 (1985) (citing cases). To illustrate the intended difference, however, operation of a police force is a quintessential "governmental function," *Morris*, 781 F.2d at 220, and the "design and planning of a transportation system" also falls into the "governmental" category. *McKethean v. WMATA*, 588 A.2d 708, 713-14 (D.C. Ct. App. 1991). The provision of mass transportation by a public body, however, is generally recognized as a "proprietary" function. *Qasim v. WMATA*, 455 A.2d 904, 906 (D.C. 1983).

[8] Pursuant to the FTCA, the Government has not waived its immunity as to

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty on the part of a federal agency or an employee of the Government*, whether or not the discretion involved be abused.

28 U.S.C. § 2680 (emphasis added).

of public officials are recognized as being within a "subset of governmental functions." *Id.* at 1155 n.9. In essence, all "discretionary" activities of a governmental entity under the FTCA constitute "governmental" activities within the meaning of the "governmental/proprietary" test. Therefore, the legal principles developed under the FTCA are a useful analytical tool for identifying the scope of the METRO's immunity.

The Supreme Court long ago characterized the FTCA as distinguishing between "acts of a governmental nature or function," which remain immune, and ministerial functions resulting in "ordinary common-law torts," as to which the FTCA has waived governmental immunity. *Dalehite v. United States*, 346 U.S. 15, 28 (1953). Thirteen years after the Supreme Court's decision in *Dalehite* enunciated the distinction between discretionary and ministerial functions, the Compact came into existence. The Compact "accepted the *Dalehite* conception" and, as the FTCA does for the federal government, provided that the METRO is not liable for torts occurring in the performance of a governmental function. *Sanders*, 819 F.2d at 1155. Because of the FTCA's similarity to Section 80 in provisions and purpose, we agree with the Court of Appeals for the District of Columbia that it is appropriate for us to analogize the immunity aspects of the Compact to the principles developed under the FTCA.[9] Applying this rationale, we will analyze the METRO's immunity claim in this case on the basis of the FTCA's legal principles.

## C.

Our sister circuit in the seat of Government, which often addresses issues on the METRO Compact, has developed two alternate tests to assist in the identification of "governmental" functions under the Compact. *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997). First, that court has recognized that if the METRO is engaged

---

[9]We recently recognized that a proper consideration in construing the Compact is the maintenance of consistency between the legal interpretations of the "two federal circuits most likely to hear cases in which [METRO] is a party," i.e., this Court and the Court of Appeals for the District of Columbia. *Lizzi v. Alexander*, 255 F.3d 128, 134 (4th Cir. 2001).

in a quintessential governmental function, its activities fall within the scope of its immunity. *Id.* If the METRO is not engaged in such a governmental function, however, a court must proceed to the second inquiry, and it must determine whether the challenged activity is discretionary or ministerial, the dichotomy employed by the FTCA. *Id.*

If the challenged activity is discretionary in nature, it falls within what has long been called the "discretionary function exception."[10] *Coates v. United States*, 181 F.2d 816, 817 (8th Cir. 1950). Under the discretionary function exception, the METRO is immune from any claim, "however negligently caused, that affect[s] the governmental functions."[11] *Dalehite*, 346 U.S. at 32. A ministerial activity of the government, on the other hand, "connotes the execution of policy as distinct from its formulation," *Griggs v. WMATA*, 232 F.3d 917, 921 (D.C. Cir. 2000), and such activities are not accorded immunity protection.

Most significantly in the context of this case, the Supreme Court, in 1991, made clear in *United States v. Gaubert* that discretionary acts deserving of immunity are not limited to policymaking or planning decisions; day-to-day management can also involve discretionary choices grounded in regulatory policy. 499 U.S. 315, 325 (1991). It is now settled that the day-to-day operational decisions of government are entitled to immunity under the FTCA so long as the choices are "susceptible to policy analysis." *Id.* at 325.

In order to determine whether an act or omission is a discretionary one — and therefore immune — we first assess whether an official

---

[10]The term "discretionary function exception," standing alone, is somewhat misleading. It constitutes an exception to the waiver of immunity contained in the FTCA, meaning that if an activity of the METRO falls within the exception, it is entitled to be accorded governmental immunity. *See Williams v. United States*, 50 F.3d 299, 304-05 (4th Cir. 1995).

[11]A prime example of negligence *not* immune and for which the government is liable is "negligence in the operation of vehicles." *Dalehite*, 346 U.S. at 29; *see also United States v. Gaubert*, 499 U.S. 315, 325 n.7 (1991) ("Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.").

or employee exercised "due care in carrying out statutes or regulations whether valid or not." *Dalehite*, 346 U.S. at 33. As the Supreme Court has framed it, "conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). And the analysis does not end there, for even if "the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield," that is, decisions "grounded in social, economic, and political policy." *Id.* at 537; *Dalehite*, 346 U.S. at 36 ("Where there is room for policy judgment and decision there is discretion.").

When a public employee makes a discretionary judgment in performing governmental duties, that judgment is entitled to immunity from liability "whether or not the discretion involved be abused." *Dalehite*, 346 U.S. at 33; *see also Souders v. WMATA*, 48 F.3d 546, 550 (D.C. Cir. 1995) ("[T]he hard fact remains that insulating policy determinations, good and bad, is the raison d'etre of the discretionary function exception."). As a reviewing court, we are not to inquire whether policy considerations *were actually* contemplated in making a decision. On the contrary, "a reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 720-21 (4th Cir. 1993). If a governmental decision is susceptible to policy analysis and if, as Justice White stated, it is "grounded in the social, economic, or political goals of the statute and regulations," that decision is entitled to immunity protection. *Gaubert*, 499 U.S. at 323.

### III.

Given this framework, we turn to the theories of negligence asserted against the METRO by Smith. *See supra* at 4. Because there are no issues of material fact bearing on the immunity claim of the METRO in this case, we will apply the legal principles enunciated above, particularly the Court's explication of the discretionary function exception in *United States v. Gaubert*, and assess whether, and to what extent, the METRO's immunity claim must be recognized.

## A.

Faced with what plainly constituted an emergency situation at the Bethesda station on July 20, 1998, the METRO determined that it should shut down Escalator One and utilize it as a stationary walker.[12] There being no statutory or regulatory mandate specifically governing the METRO's actions in response to that situation, the METRO personnel at the Bethesda station were forced to make difficult choices. For example, with two of their three escalators out of service, they could (a) stop Escalator One and allow METRO patrons to both enter and exit the Bethesda station by using it as a stationary walker, or (b) operate Escalator One up or down, compelling all patrons moving in the *other* direction to use the elevator.[13]

There were potential economic and political costs to the METRO in choosing between such unattractive resolutions of its problem. For instance, its decision, however made, might well have resulted in public outrage, adverse media coverage, or political fallout. A decision to permit entering and exiting METRO passengers to choose between walking on a stationary escalator or riding an elevator, rather than compelling the passengers moving in one direction to use the elevator, is plainly a decision "susceptible to policy judgment," and it involves the "exercise of 'political, social, or economic judgment.'" *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995) (quoting *Gaubert*, 499 U.S. at 325); *Baum v. United States*, 986 F.2d 716, 721 (4th Cir.

---

[12]Regarding the first negligence theory, i.e., the METRO's decision to shut down Escalator One in order to use it as a stationary walker, the district court's statements seem unclear. On the one hand, it recognized that the ANSI Code did not prohibit the usage of the escalator as a walker; on the other hand, it also stated that "the opinion of the Chief Inspector as to the interpretation of the elevator and safety code provides a sufficient basis for establishing a statutory violation." Opinion at 14; 133 F. Supp. 2d at 404. Regardless, the Opinion contemplates that the use of Escalator One as a walker is part of the outstanding and viable case against the METRO. As such, we must construe this negligence theory as having been resolved against the METRO and as being a viable issue on appeal.

[13]There may have been other options available to the METRO. For example, it could have shut down the Bethesda station entirely.

1993) (noting that discretionary decision is "one which we would expect inherently to be grounded in considerations of policy," and is subject to "well-established presumption that public officials have properly discharged their official duties"). Indeed, the choices presented with respect to operations at the Bethesda station on July 20, 1998, implicated the METRO's mission — public transportation — and its ability to fulfill that mission in a safe and efficient manner. In sum, the choices confronting the METRO at Bethesda on July 20 involved, as the Court of Appeals for the District of Columbia astutely put it, "not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." *Cope*, 45 F.3d at 450 (quoting *Sami v. United States*, 617 F.2d 755, 766 (D.C. Cir. 1979)).

The METRO officials at the Bethesda station on July 20, 1998, acted precisely as they were bound to act. They responded to the situation in a manner that implicated both their mission and public policy, and they decided to shut down Escalator One and use it as a stationary walker. This governmental decision was plainly of the discretionary variety, and it is entitled to be accorded immunity protection.

### B.

The METRO's decision not to reassemble Escalator Three for use during rush hour on July 20, 1998, is also a governmental decision shielded by the discretionary function exception. That decision is "susceptible to policy analysis," *Gaubert*, 499 U.S. at 325, and it involved the exercise of economic policy judgment. *Id.* at 323. There being no specific statutory or regulatory mandate for the METRO to reassemble Escalator Three, the potential choices implicated the economic policy of the METRO, i.e., whether it was more cost-effective to reassemble Escalator Three pending repair, or whether to wait until replacement parts arrived. Even if this decision had been incorrect, and even if it had constituted an abuse of discretion, it is, under the circumstances, deserving of immunity protection. *Dalehite v. United States*, 346 U.S. 15, 33 (1953).

### C.

In the face of the situation at the Bethesda station on July 20, 1998, the METRO is also immune for its alleged failure to properly warn

its Bethesda patrons of the inoperative status of Escalators Two and Three. *Rosebush v. United States*, 119 F.3d 438, 443 (6th Cir. 1997) ("Decisions concerning the proper response to hazards are protected from tort liability by the discretionary function exception."); *see also Williams v. United States*, 50 F.3d 299, 310 (4th Cir. 1995). In this connection, we assess only the METRO's asserted failure to warn Smith of the emergency situation on July 20, i.e., its failure to post temporary signs or personnel at the Bethesda station advising its patrons of the inoperative escalators and the location of the elevator.

As with its decisions on the utilization of Escalator One as a stationary walker and to delay reassembly of Escalator Three pending the arrival of replacement parts, no specific statute or regulation mandated any certain course of action by the METRO. Importantly, any hazardous condition present on that occasion was obvious, and where "the danger is not hidden, there is no duty to warn." *Rich v. United States*, 119 F.3d 447, 452 (6th Cir. 1997). For example, the long line of patrons waiting to use the elevator at the Bethesda station indicated both where it was located and that it was functional. And even after Smith's arrival at the Bethesda station, when he became aware of any existing hazard, he had other available options. He could have waited for the elevator, or he could have decided to board another METRO train and depart the station. The METRO is entitled to be accorded immunity from a negligence claim in this situation, because, as the Sixth Circuit has held, "[a]ny duty to warn of this open and obvious hazard is discretionary and exempt from an action in tort." *Id.*

### D.

In its Opinion, the district court ruled in favor of the METRO on Smith's fourth theory of negligence, i.e., the failure of its signage and illumination to comply with the requirements of the ANSI Code. *See supra* at 4. The court concluded that the METRO is immune from any theory of negligence based on the assertion that its permanent signage and illumination failed to comply with the law, because the METRO is immune from challenges to the design of its stations.[14] Opinion at

---

[14]While Smith also maintained that the permanent signage and illumination at the Bethesda station contravened the ANSI Code, the district

17 n.2; 133 F. Supp. 2d at 406 n.2. As a result of this ruling by the district court, the theory of design defect is not before us in this appeal.

E.

Finally, Smith contends that the METRO negligently failed to repair and maintain Escalators Two and Three at the Bethesda station, and that such failure proximately caused his death. In addressing this contention, we first observe that the issue of whether this negligence theory is properly on appeal is somewhat problematic. In its Opinion, the district court broadly observed that there was a lack of proximate cause between the "statutory violations" and Smith's heart attack. Specifically, it determined that "[p]laintiffs have not sustained their burden to show that the injury suffered by their son was of the kind contemplated by the legislature in adopting the [ANSI] Code. Therefore, as a matter of law, Plaintiffs have not shown the alleged statutory violations proximately caused their son's death." Opinion at 15; 133 F. Supp. 2d at 404. This conclusion indicates that the court contemplated awarding summary judgment to the METRO, on the basis of lack of proximate cause, with respect to alleged violations of the ANSI Code.[15] If such was the case, then there would be nothing for us to address on interlocutory appeal of this negligence theory, because the METRO would have already prevailed on the merits. However, the court also observed that "the heart of Plaintiff's complaint is the failure to repair and maintain the primary means of ingress and egress from the station's premises," and that "this conduct

court examined this contention carefully and ruled against him. It concluded that there was an insufficient nexus between, on the one hand, the harms the ANSI Code was designed to prevent and, on the other, any harm suffered by Smith. Specifically, the court determined that "as a matter of law, Plaintiffs have not shown the alleged violations proximately caused their son's death, and an action for damages may not lie based upon the theory of a statutory violation." Opinion at 15; 133 F. Supp. 2d at 404.

[15]Indeed, Smith's counsel stated at oral argument that if the METRO's decision to shut down Escalator One on July 20, 1998, is entitled to immunity, this is "the end to this case."

does not fall within the scope of [METRO's] immunity." *Id.* at 20. In the context of these conflicting statements, the breadth of the court's assessment of proximate cause is sufficiently vague to warrant that its scope should be defined by the district court.

For the purposes of the METRO's interlocutory appeal, however, we possess jurisdiction only with respect to its claim of immunity. To the extent that the METRO's repair and maintenance of Escalators Two and Three contravened applicable requirements of the ANSI Code, such repair and maintenance would not involve "an element of judgment or choice," and it would therefore fall outside the discretionary function exception.[16] *Berkovitz*, 486 U.S. at 536. In such a circumstance, the METRO would not be entitled to immunity on this theory of negligence.

On remand, the district court should first accord the METRO the immunity to which it is entitled. Then, if necessary, it can decide whether Smith can make a prima facie showing of negligent repair and maintenance, and it can also assess whether there is a sufficient proximate cause nexus between such a showing and Smith's death. The district court should then determine whether anything is left of this case.

### IV.

In summary, we conclude that the METRO is entitled to be accorded immunity under the discretionary function exception for its decisions at the Bethesda station on July 20, 1998: (1) to brake Escalator One and utilize it as a stationary walker; (2) to leave Escalator Three disassembled; and (3) to provide no specific warning to its patrons of the situation at the station. We therefore vacate the partial

---

[16]Although the METRO is not generally governed by state law, the Compact requires that it comply with the "laws, rules, regulations and orders relating to inspection of equipment and facilities, safety and testing." Md. Code Ann. Trans. § 10-204 ¶ 77 (1999). Violation of an applicable ANSI standard is evidence of negligence in Maryland. *Kent Village Assocs. Joint Venture v. Smith*, 657 A.2d 330, 337 (Md. Ct. Spec. App. 1995).

denial of the METRO's claim of immunity, and we remand for any further proceedings that may be appropriate.

*VACATED AND REMANDED*

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

The majority follows the D.C. Circuit by holding that the immunity for "governmental functions" conferred by section 80 of the METRO Compact is at least as broad as that conferred by the discretionary function exception, 28 U.S.C. § 2680(a), to the Federal Tort Claims Act. As the D.C. Circuit explained in *Burkhart v. WMATA*, 112 F.3d 1207, 1216-17 (D.C. Cir. 1997), this means that the METRO is immune from liability for any acts and omissions that are "susceptible to policy analysis" under the standard established by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315, 325 (1991). Applying the *Gaubert* standard, the majority concludes that the METRO is entitled to immunity on all but one of the theories of negligence advanced by Richard H. Smith's family and estate. Most strikingly, the majority holds in part III B of its opinion that the METRO is immune from liability for its decision not to reassemble Escalator Three because that decision could have been based on a judgment that the costs of reassembling the escalator outweighed the safety benefits of reassembly. Because I cannot believe that the framers of the METRO Compact intended for the governmental function exception in section 80 to sweep so broadly, I must respectfully dissent from the majority's analysis.

The majority suggests that under *Gaubert* any decision that can be characterized as an effort to cut costs is "the kind of policy judgment that the discretionary function exception was designed to shield." *Id.* at 332. Remarkably, this extremely broad reading of the discretionary function exception appears to be consistent with our prior cases. Although there is something commendable in the majority's refusal to flinch from *Gaubert*'s implications, the majority's analysis makes it disturbingly clear that the discretionary function exception has in fact swallowed up the FTCA's ostensibly broad waiver of sovereign immunity. This means that the majority's initial decision to follow the D.C. Circuit comes at a heavy price: the price of maintaining consistency between our circuit and the D.C. Circuit is nothing less than

evisceration of the waiver of sovereign immunity in section 80 of the METRO Compact. Because I think that price is too high, I dissent from the majority's decision in parts II B and C of its opinion to analyze the METRO's immunity by using *Gaubert*'s susceptible-to-policy-analysis standard. I would adopt a narrower view of the immunity conferred by section 80 of the METRO Compact by reading the governmental function exception along the lines suggested by Justice Scalia in his concurring opinion in *Gaubert*. Under that standard the METRO (as the district court concluded) has not established its immunity on any of the theories of negligence that survived the district court's summary judgment ruling. It follows that I also dissent from parts III A, B, and C of the majority opinion. I concur in the remainder of the opinion.

I will first explain why the majority's analysis allows the exception for governmental functions in section 80 of the METRO Compact to swallow up the Compact's general waiver of sovereign immunity. I then explain why the better course would be to analyze the governmental function exception using the standard suggested by Justice Scalia in his *Gaubert* concurrence. Finally, I explain how I would apply that standard to the claims before us.

I.

Section 80 of the METRO Compact provides that the METRO "shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed in the conduct of any proprietary function . . . but shall not be liable for any torts occurring in the performance of a governmental function." As the majority explains, *ante* at 9, the D.C. Circuit has read section 80 to confer immunity on the METRO for all its "quintessential governmental function[s]," such as police activity. *Burkhart*, 112 F.3d at 1216 (internal quotation marks and citation omitted). Where, as here, the allegedly tortious conduct did not occur in the METRO's performance of a quintessentially governmental function, the D.C. Circuit looks to the case law interpreting the discretionary function exception in the Federal Tort Claims Act (FTCA) to decide whether the conduct occurred in the performance of a governmental function or a proprietary function. *Id.* Following the D.C. Circuit, the majority today holds that "all 'discretionary' activities of a governmental entity under

the FTCA constitute 'governmental' activities within the meaning of the 'governmental/proprietary' test." *Ante* at 8. To understand the consequences of this decision, it will be necessary to review briefly the Supreme Court's recent decisions interpreting the discretionary function exception.

The Supreme Court's decision in *Berkovitz v. United States*, 486 U.S. 531 (1988), created a two-pronged test for applying the discretionary function exception. First, courts ask whether the governmental action complained of "involves an element of judgment or choice." *Id.* at 536. When a statute, regulation, or policy prescribes a specific course of action, the negligent failure to follow that course is not protected by the discretionary function exception. *Id.* Second, if the challenged conduct is discretionary, courts then ask whether the judgment involved is "of the kind that the discretionary function exception was designed to shield." *Id.* The exception protects only decisions "grounded in social, economic, [or] political policy." *Id.* at 537 (internal quotation marks and citation omitted).

Because most government decisions involve at least some degree of choice, courts applying the *Berkovitz* test have frequently had to decide whether a government decision was sufficiently policy based to deserve the protection of the discretionary function exception. Prior to the Court's 1991 decision in *Gaubert*, the case law interpreting the discretionary function exception suggested several possible limits on the range of government conduct that could be seen as grounded in social, economic, or political policy. *See, e.g., Gaubert v. United States*, 885 F.2d 1284, 1289 (5th Cir. 1989) (suggesting that decisions made at the operational rather than the planning level do not qualify as policy based under the second prong of *Berkovitz*), *rev'd sub nom. United States v. Gaubert*, 499 U.S. 315 (1991); *Dube v. Pittsburgh Corning*, 870 F.2d 790, 797-800 (1st Cir. 1989) (holding that the discretionary function exception does not apply when the government fails to make an actual policy judgment), *abrogation recognized by Shansky v. United States*, 164 F.3d 688, 692 n.4 (1st Cir. 1999); *Blessing v. United States*, 447 F.Supp. 1160, 1184 (E.D. Pa. 1978) (stating that the discretionary function exception should apply only if the official who made a challenged decision had the authority to make that decision). *Gaubert*, however, rejected these limitations on the scope of the discretionary function exception. First, *Gaubert* made

clear that an operational decision by a relatively low-level employee can be grounded in social, economic, or political policy for purposes of the discretionary function exception. *Gaubert*, 499 U.S. at 325-26. Second, *Gaubert* held that the government may enjoy the protection of the discretionary function exception without any showing that its employees actually considered policy goals in making the decisions alleged to be negligent: "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325. *See also Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993). As the First Circuit has explained, the critical question after *Gaubert* is "whether some plausible policy justification *could have* undergirded the challenged conduct." *Shansky v. United States*, 164 F.3d 688, 692 (1st Cir. 1999) (emphasis added). Finally, the *Gaubert* majority apparently held that a governmental decision can be susceptible to policy analysis (and thus within the scope of the discretionary function exception) even if the decision was made by an employee who lacked the authority to consider matters of social, economic, or political policy.[1]

*Gaubert*'s susceptible-to-policy analysis standard has significantly broadened the scope of the discretionary function exception. *See* Bruce A. Peterson and Mark E. Van Der Weide, *Susceptible to Faulty Analysis:* United States v. Gaubert *and the Resurrection of Federal Sovereign Immunity*, 72 Notre Dame L. Rev. 447, 465-73 (1997) (surveying the post-*Gaubert* case law and concluding that the government wins more cases, and wins them at earlier stages of litigation, after

---

[1] The *Gaubert* majority did not explicitly address this point, but Justice Scalia's concurrence clearly states that the discretionary function exception should apply only when "the decisionmaker [is] an official who possesses the relevant policy responsibility." *Gaubert*, 499 U.S. at 336 (Scalia, J., concurring in part and concurring in the judgment). The *Gaubert* majority's silence in the face of Justice Scalia's insistence that the actual decisionmaker be authorized to make policy judgments is naturally read to signal indifference to that requirement. The majority's opinion in this case appears to agree with my reading of *Gaubert*, for it fails to address the questions of who made the decisions challenged by Smith's family and estate and whether those persons had the authority to make policy judgments.

*Gaubert* than before). Because the *Gaubert* standard asks only whether allegedly negligent government conduct could have been based on policy judgments, courts have had difficulty in placing any principled limits on the range of conduct that counts as grounded in social, economic, or political policy.[2] *See Rosebush v. United States*, 119 F.3d 438, 444-45 (6th Cir. 1997) (Merritt, J., dissenting) (stating that the second prong of the *Berkovitz-Gaubert* test "presents an ambiguous standard that is difficult to apply and that has produced a large number of inconsistent holdings in the circuit and district courts"). One fertile ground of dispute has been the question of whether decisions that can be seen as responsive to agency budget constraints should count as "grounded in economic policy" for purposes of the discretionary function exception. *See Domme v. United States*, 61 F.3d 787, 793-94 (10th Cir. 1995) (Henry, J., concurring) (recognizing disagreement in the case law about whether government decisions should be treated as policy based simply because they implicate economic considerations). Several judges have voiced concern that if government choices are immune simply because those choices could have been motivated by a desire to cut costs, the discretionary function exception will gut the FTCA's waiver of sovereign immunity. *See, e.g.*, *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995) (observing that if any decision responsive to budgetary constraints counts as grounded in economic policy, the discretionary function exception would "swallow the FTCA's sweeping waiver of sovereign immunity"); *Domme*, 61 F.3d at 795 (Henry, J., concurring) (observing that "unless courts routinely inquire as to whether government employees have the authority to make the sorts of decisions that result

---

[2]There are exceptions, of course. The First Circuit has identified a line of cases suggesting that the discretionary function exception covers judgments that balance "incommensurable values in order to establish [policy] priorities" but does not protect "judgment[s] that embod[y] a professional assessment undertaken pursuant to a policy of settled priorities." *Shansky*, 164 F.3d at 694. *See also Cope v. Scott*, 45 F.3d 445, 451-52 (D.C. Cir. 1995) (holding that the discretionary function exception did not protect the government's allegedly negligent failure to post proper warnings at certain points along a park road because the government had already chosen to place numerous road signs along the same stretch of road and "the discretion regarding where and what type of signs to post is not the kind of discretion protected by the discretionary function exception").

in injuring people, the fact that it is reasonable to view most government decisions as having economic implications could eviscerate the Federal Tort Claims Act").

Today, the majority squarely aligns this circuit with those courts that have been willing to treat decisions that could have been motivated by a desire to reduce costs as grounded in economic policy under *Gaubert* and *Berkovitz*. In part III B of its opinion, the majority holds that the discretionary function exception protects the METRO's decision not to reassemble Escalator Three for use as a walker. According to the majority, this decision involved the kind of discretion the discretionary function exception was meant to shield because it "implicated the economic policy of the METRO, i.e., whether it was more cost-effective to reassemble Escalator Three pending repair, or whether to wait until replacement parts arrived." *Ante* at 12. This, to me, is a remarkable result. As any first-year law student knows, the basic approach to negligence law outlined by Judge Learned Hand in *United States v. Carroll Towing Co.*, 159 F.2d 169 (2d Cir. 1947), essentially defines negligence as the unreasonable balancing of the cost of safety measures against the risk of accidents. *See id.* at 173 (explaining that "if the probability [of an accident] be called P; the injury, L; and the burden [of adequate precautions], B; liability depends upon whether B is less than L multiplied by P: i.e., whether $B<PL$"). Even on the most charitable interpretation of the facts, this is exactly the sort of balancing that was going on when the METRO decided not to reassemble the steps on Escalator Three. The decision that the risks of not reassembling Escalator Three were outweighed by the cost of reassembly involved "the same kind of balancing which citizens do at their peril," *Dalehite v. United States*, 346 U.S. 15, 60 (1953) (Jackson, J., dissenting), and which courts review every day using ordinary tort law standards, *cf. Blessing*, 447 F.Supp. at 1183 n.30 (explaining that the discretionary function exception should apply to the sorts of policy judgments that cannot be reviewed under ordinary tort law standards of due care and reasonableness). If this sort of balancing is immune from judicial review, the discretionary function exception has eclipsed the FTCA's basic goal of making the government liable for tort claims "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the [tortious] act or omission occurred." 28 U.S.C. § 1346(b)(1).

The majority's holding in part III B is all the more striking because, consistent with *Gaubert*, the majority pays no attention to the actual processes that led to the decision not to reassemble Escalator Three. The summary judgment record contains no evidence that *anyone* consciously weighed the costs in time and labor of reassembling Escalator Three versus the benefits in increased passenger safety and convenience. The record does not indicate who made the decision. Indeed, the record does not even indicate who had the authority to make the decision. Viewing the evidence in the light most favorable to Smith's family and estate, a reasonable jury could conclude that the decision not to reassemble Escalator Three was made by the escalator repair crew without any significant consultation with supervisory officials and that the repair crew neither sought to balance competing policy considerations nor had the authority to do so. *Cf. Domme*, 61 F.3d at 795 (Henry, J., concurring) ("[A] nonmanagerial employee who, away from the quiet and measured reflection of a budget meeting, decides to compromise safety in order to save government resources may simply be trying to make his or her job easier rather than trying to serve the common good."). If the decision not to reassemble Escalator Three counts as a judgment grounded in the economic policy of the METRO, the discretionary function exception truly has swallowed up the FTCA's waiver of immunity because there are precious few governmental decisions that cannot be seen as an effort to save costs. *See Cope*, 45 F.3d at 449 (noting that after government counsel had argued that any decision implicating budgetary concerns should fall within the discretionary function exception, counsel failed during oral argument to provide "even one example of a discretionary decision that would not be exempt for failure to implicate policy concerns" aside from the standard example that the discretionary function exception does not cover the negligent operation of motor vehicles by government employees).[3] Consequently, the upshot

---

[3]Like the government's counsel in *Cope*, the majority acknowledges that negligent operation of motor vehicles does not fall within the discretionary function exception. *See ante* at 9 n.11. Thus, the majority would presumably conclude that the METRO would not be immune from liability if one of its bus drivers caused an accident by driving at an unsafe rate of speed. But it is not obvious why a bus driver's decision to drive at an excessive rate of speed in an effort to be on time at the next bus stop is distinguishable from the METRO's decision that reassembling Escalator Three would be too costly. Each decision can be said with equal plausibility to implicate the METRO's policy objectives.

of the majority's approach to the discretionary function exception is that the government will nearly always be immune for its actions so long as it has not enacted regulations that completely eliminate the discretion of its employees.

All that said, I cannot say that the majority's analysis in part III B is an unreasonable, or even an incorrect, application of *Gaubert*'s susceptible-to-policy-analysis standard. Although some courts have expressed misgivings about an overly broad interpretation of this standard, no court has held that a judgment based on the desire to cut costs can *never* qualify as "grounded in economic policy" for purposes of the discretionary function exception analysis. Indeed, such a rule would produce its own set of problems because in many instances government decisions based on cost considerations ought to enjoy the protection of the discretionary function exception. *See, e.g.*, *United States v. Varig Airlines*, 467 U.S. 797, 820 (1984) (explaining that decisions requiring an agency "to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding" are protected by the discretionary function exception); *Cope*, 45 F.3d at 451 (explaining that the government's decisions about whether and when to improve the degree of skid resistance on a section of park road were protected by the discretionary function exception because they involved considerations including "the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards"). Further, our circuit's case law on the discretionary function exception has signaled our willingness to consider decisions that implicate budgetary concerns as sufficiently policy based to receive immunity. *See Williams v. United States*, 50 F.3d 299, 310 (4th Cir. 1995) ("Contracting out the responsibility to maintain [office space leased by the United States] while balancing fiscal considerations entails exercising judgment based on policy."); *Bowman v. United States*, 820 F.2d 1393, 1395 (4th Cir. 1987) (characterizing a decision based on "a lack of financial resources" as a "policy judgment"). For these reasons, I must conclude that, even in part III B, the majority has correctly applied our circuit's discretionary function exception precedents to the facts of this case. It follows that if this case was about the meaning of the discretionary function exception, I would be bound to concur in the result reached by the majority.

Here, however, we are asked to interpret the METRO Compact, and we are not required to follow the *Gaubert* standard wherever it might lead. I suggest that if a correct application of the *Gaubert* standard leads to the result in part III B, this only highlights the shortcomings of that standard and provides a significant reason to consider using a different standard to interpret the METRO Compact.

As the majority's analysis illustrates, the *Gaubert* approach tends to push courts toward holding that judgments involving tradeoffs between cost and safety are grounded in economic policy for purposes of the discretionary function exception. Although such holdings threaten to eviscerate the FTCA, the alternative of claiming that decisions based on budget constraints and the like are never policy based is equally unpalatable. The more reasonable view is that sometimes government decisions requiring tradeoffs between cost and safety deserve the protection of the discretionary function exception, and sometimes they do not. For example, if an agency makes judgments about the cost-effectiveness of various safety measures and expresses those judgments in the form of a regulation, the discretionary function exception does (and should) protect the regulation (and any conduct it requires) from judicial second-guessing. As Justice Scalia points out, the FTCA's exclusion of liability for all acts of government employees performed with due care "in the execution of a . . . regulation, whether or not such . . . regulation be valid," 28 U.S.C. § 2680(a), "represents an absolute statutory presumption . . . that all regulations involve policy judgments that must not be interfered with," *Gaubert*, 499 U.S. at 336-37 (Scalia, J., concurring in part and concurring in the judgment). But as my discussion of the METRO's decision not to reassemble Escalator Three illustrates, the thoughtless failure of low-level employees to take certain safety precautions ought not to be protected by the discretionary function exception simply because the failure could be rationalized as an effort to save government dollars. These examples suggest that whether the discretionary function exception's protection is warranted depends at least in part on the process by which government decisions are made. *See id.* at 335 (Scalia, J., concurring in part and concurring in the judgment in part) (suggesting that "the level at which the decision is made is often *relevant* to the discretionary function inquiry, since the answer to that inquiry turns on *both* the subject matter [of the decision] *and* the office of the decisionmaker"); *see also* Peterson and

Van Der Weide, *supra*, at 487-502 (suggesting that "[d]iscretionary function immunity ought to be reserved for (1) actual decisions (2) made by government officials possessing authority to direct policy (3) in consideration of legitimate policy factors"); Harold J. Krent, *Preserving Discretion Without Sacrificing Deterrence: Federal Government Liability in Tort*, 38 UCLA L. Rev. 871, 915 (1991) (suggesting that courts should approach the discretionary function exception by "focus[ing] on the decision making process underlying the governmental action challenged"). By eliminating any consideration of the decisionmaker's authority or the manner in which decisions were actually made, *Gaubert* leaves courts without the analytical tools needed to place sensible limits on the scope of the discretionary function exception. This means that we ought to think long and hard before deciding to follow the D.C. Circuit by exporting the shortcomings of the *Gaubert* standard into our law governing the scope of the METRO's sovereign immunity.

## II.

As I explained in part I, the majority's disposition of this case is correct if *Gaubert* provides the proper standard for interpreting section 80 of the METRO Compact. Before proceeding any further, however, it is worth pointing out that the majority's disposition is correct *only* if *Gaubert* is the proper standard; any other approach to reading section 80 would require a different result. If, for example, we read section 80 literally and applied the distinction between governmental and proprietary activities, operating escalators as part of a public transportation system would surely be classified as proprietary and would therefore be unprotected by the METRO's immunity. *See Wainwright v. WMATA*, 958 F.Supp. 6, 9 (D.D.C. 1997) (stating that the METRO's operation of an escalator is a proprietary function); *Warren v. WMATA*, 880 F.Supp. 14, 16 (D.D.C. 1995) (stating that the METRO's "provision of mass transit is generally considered a proprietary function that would not be protected by sovereign immunity"). If we read section 80 as drawing a distinction between planning and operational activities — in other words, if we read section 80 in roughly the same way that many courts read the discretionary function exception prior to *Gaubert* — surely the actions of the METRO in this case fall on the operational side of the line. *Cf. Dant v. District of Columbia*, 829 F.2d 69, 74-75 (D.C. Cir. 1987) (granting

immunity to the METRO on claim that it negligently designed its fare collection system, but denying immunity on claim that the METRO negligently operated and maintained the fare collection system because negligent operation and maintenance are ministerial activities). Likewise, if we read section 80 along the lines suggested by Justice Scalia's concurrence in *Gaubert*, we would again hold that the METRO was not entitled to summary judgment on its immunity claim because a reasonable jury could conclude that the allegedly negligent decisions in this case were not made by any person who had the authority to make judgments based on social, economic, or political policy. *See Gaubert*, 499 U.S. at 335 (Scalia, J., concurring in part and concurring in the judgment). In sum, only the *Gaubert* approach to governmental immunity is expansive enough to justify the result the majority reaches today. This point underscores the importance of asking whether there are good reasons for following the D.C. Circuit's decision to use *Gaubert* to analyze the governmental function exception in section 80 of the METRO Compact. I submit that the D.C. Circuit's approach to the governmental function exception is inconsistent with the intent of the Compact's framers and that any pragmatic considerations supporting that circuit's approach are not strong enough to justify it.

The D.C. Circuit first held in *Sanders v. WMATA*, 819 F.2d 1151 (D.C. Cir. 1987), that the governmental function exception in the METRO Compact should be analogized to the discretionary function exception in the FTCA. In *Sanders* the court began its analysis by observing that the meaning of the governmental/proprietary distinction in section 80 is a question of federal law. *See id.* at 1154. The court then explained that because Congress had played an active role in the creation and approval of the METRO Compact, the decision to grant immunity for torts committed by METRO employees in the performance of governmental functions should be understood as a decision to adopt Congress's understanding of "governmental function." That understanding, the court reasoned, was embodied in the Supreme Court's decision in *Dalehite v. United States*, 346 U.S. 15 (1953), where the Supreme Court construed the discretionary function exception to the FTCA as an effort to free the government from "liability arising from acts of a governmental nature or function." *Id.* at 28. Accordingly, the *Sanders* court concluded that the framers of the METRO Compact (Maryland, Virginia, and the District of Columbia)

had "accepted the *Dalehite* conception" when they chose to grant the METRO immunity from tort liability for its performance of governmental functions. *Sanders*, 819 F.2d at 1155. The D.C. Circuit later extended this reasoning in *Burkhart*, holding that the Supreme Court's analysis of the discretionary function exception in *Gaubert* should also apply to the interpretation of "governmental function" in section 80 of the METRO Compact. *Burkhart*, 112 F.3d at 1216. The majority adopts the D.C. Circuit's analysis in *Sanders* and *Burkhart* in parts II B and C of its opinion.

With all respect to the majority and our sister circuit, I do not believe that the framers of the METRO Compact intended the governmental/proprietary distinction in section 80 to track the distinction between discretionary and ministerial acts in § 2680(a) of the FTCA. To begin with the most obvious point, surely the Compact's framers would have used the terms "discretionary" and "ministerial" in section 80 if they had meant to signal their allegiance to *Dalehite*. Instead, the framers used the traditional language of municipal immunity. *See* 18 Eugene McQuillin, *The Law of Municipal Corporations* § 53.02.05 (3d ed. 1993) (explaining that the distinction between governmental and proprietary functions is the oldest approach to the law of municipal immunity). The Supreme Court's decision in *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), casts further doubt on the claim that the Compact's framers intended to adopt the understanding of governmental functions expressed in *Dalehite*. In *Indian Towing* the Supreme Court explicitly rejected the governmental/proprietary distinction as a proper framework for interpreting the FTCA. The Court characterized the law of municipal liability as a "quagmire" and the rule of law distinguishing "governmental" from "non-governmental" (or proprietary) functions as "inherently unsound." *Id.* at 65. It explained that the FTCA is a repudiation of the "casuistries of municipal liability for torts." *Id.* If the framers of the Compact can be presumed to have been aware of *Dalehite*, they must also be presumed to have been aware of *Indian Towing*. In light of *Indian Towing*'s insistence that the FTCA does not carry forward the doctrines of municipal liability, it is hard to believe that the framers of the Compact would have employed the governmental/proprietary distinction in section 80 in order to adopt the reading of the FTCA set forth in *Dalehite*. It makes far more sense to believe that section 80 was drafted as a compromise between the differing rules of governmental

immunity then followed by the Compact's signatories. *Cf. Martin v. WMATA*, 667 F.2d 435, 436 (4th Cir. 1981).

Moreover, even if it was reasonable to believe that the framers of the METRO Compact meant to accept the *Dalehite* conception of governmental tort immunity, it would not follow that they meant for the governmental function exception in the METRO Compact to expand or contract with the Supreme Court's rulings on the scope of the discretionary function exception. *Dalehite* was widely understood to employ a distinction between planning and operational activities, *see* Krent, *supra*, at 880, a distinction the *Sanders* court seemed to assume when it held that the framers of the METRO Compact had accepted the *Dalehite* conception. *See Sanders*, 819 F.2d at 1156 (distinguishing between "general attacks on the testing plan itself" and attacks on the "manner of testing in a particular case" in holding that the METRO was immune from tort liability for the adoption of policy requiring drug and alcohol testing immediately after on-the-job accidents or unusual operating incidents). No one would have imagined in 1966 that the discretionary function would come to be read so broadly as the Supreme Court read it in *Gaubert*, and there is no reason to believe that the framers of the Compact would have intended that the governmental function exception in section 80 be given such a broad reading. Finally, the fact that the meaning of the governmental function exception is a matter of federal law does not indicate that the meaning of "governmental function" in the Compact should track the meaning of "discretionary function" in the FTCA. The meaning of each term may present a question of federal law, but it does not follow that each presents the same question of federal law. Consequently, I am unpersuaded by the D.C. Circuit's arguments that its approach to the METRO Compact is consistent with the intent of the Compact's framers.

Perhaps, though, the D.C. Circuit's decision to use the *Gaubert* standard in interpreting the METRO Compact's governmental function exception rests more on pragmatic considerations than on any judgment about the intent of the Compact's framers. Our sister circuit may believe that we should adopt the body of law governing the discretionary function exception when interpreting the METRO Compact simply because, when contrasted with the traditional distinctions between governmental and proprietary functions or between planning

and operational level activities, *Gaubert*'s susceptible-to-policy-analysis test at least provides a workable standard that can be consistently applied. In other words, the D.C. Circuit's argument may simply be that the *Gaubert* standard ought to be adopted because, for all its flaws, it is really the only game in town. Although I agree that the traditional distinction between governmental and proprietary functions is untenable and that we need a workable standard for determining the scope of the METRO's immunity, this argument both overstates the workability of the *Gaubert* standard and understates the viability of possible alternatives to that standard. First, I have already noted that courts have had considerable difficulty in deciding whether government actions are grounded in economic, social, or political policy. *See infra* at 20. This has led to significant inconsistency in the case law. *Compare, e.g.*, *Tippett v. United States*, 108 F.3d 1194, 1197-99 (10th Cir. 1997) (holding that government's failure to warn about the dangers of a charging moose was grounded in policy and was therefore protected by the discretionary function exception), *with George v. United States*, 735 F.Supp. 1524, 1533-34 (M.D. Ala. 1990) (stating that government's failure to warn about the presence of large alligators in a designated swimming area was not grounded in policy and was therefore outside the scope of the discretionary function exception). Indeed, I suggested above that by preventing courts from considering the decisionmaker's authority to make policy judgments, *Gaubert* deprives courts of the analytical tools they need to draw sensible distinctions in the area of governmental immunity. Second, any increase in the predictability and consistency of judicial decisions that might have come about in the wake of *Gaubert* has come at the significant cost of allowing the discretionary function exception to swallow up the FTCA's general waiver of sovereign immunity. Finally, there is at least one approach that would provide a viable alternative to the *Gaubert* standard. This is the approach suggested by Justice Scalia in his *Gaubert* concurrence. According to Justice Scalia, "a choice is shielded from liability by the discretionary function exception if the choice is, under the particular circumstances, one that ought to be informed by considerations of social, economic, or political policy and is made by an officer whose official responsibilities include assessment of those considerations." *Gaubert*, 499 U.S. at 335 (Scalia, J., concurring in part and concurring in the judgment). This standard is at least as easy to apply as the susceptible-to-policy-analysis standard adopted by the *Gaubert* majority, and it

would provide a more reasonable approach to interpreting the governmental function exception in section 80 of the METRO Compact. Further, even if it could be said that the framers of the METRO Compact "accepted the *Dalehite* conception" of governmental functions, *Sanders*, 819 F.2d at 1155, this acceptance would be better reflected in Justice Scalia's approach than in that of the *Gaubert* majority because Justice Scalia sought to preserve the insights of the planning/operational distinction suggested by *Dalehite*. *See Gaubert*, 499 U.S. at 335 (Scalia, J., concurring in part and concurring in the judgment) (explaining that his approach "recognizes that there is something to the planning vs. operational dichotomy").[4] These reasons suggest that there is at least one viable alternative to the *Gaubert* standard and that the "only game in town" argument for adopting that standard is unconvincing.

I conclude, then, that the D.C. Circuit erred in deciding that *Gaubert* provides the proper standard for defining the governmental function exception in section 80 of the METRO Compact. Yet because our sister circuit's approach to section 80 appears well-established, the cost of refusing to follow that approach is to create a circuit split between the only two circuits that are likely to hear tort claims against the METRO. As the majority points out, we have recognized that maintaining consistency between our circuit and the D.C. Circuit is an important consideration when interpreting the METRO Compact. *Ante* at 8 n.9 (citing *Lizzi v. Alexander*, 255 F.3d 128, 134 (4th Cir. 2001)). This raises the difficult question of whether adopting what I regard as a better reading of the METRO Compact is worth the price of creating a circuit split. While I appreciate the practical considerations behind the majority's decision to follow the D.C. Circuit's reading of section 80, the price of intercircuit consistency on this issue is the gutting of the Compact's waiver of sovereign immunity.

---

[4]Some commentators have suggested that the best approach to government immunity would go farther than Justice Scalia's *Gaubert* concurrence by requiring not only that decisionmakers have the authority to make policy judgments, but also that the decisionmakers actually consider policy variables in making those judgments. *See* Peterson and Van Der Weide, *supra*, at 487-90. This proposal has considerable appeal, but I would not decide its merits today because Justice Scalia's approach adequately addresses the facts of this case.

I believe that price is too high. I would therefore hold that Justice Scalia's *Gaubert* concurrence provides a better standard for deciding whether tortious conduct that does not involve quintessentially governmental activities is shielded by the METRO's immunity. Consequently, I must respectfully dissent from Parts II B and C of the majority opinion. This conclusion leaves the question of whether, under the standard proposed by Justice Scalia, the district court erred in refusing to recognize the METRO's immunity for (1) the decision to use Escalator One as a stationary walker, (2) the decision not to reassemble Escalator Three, and (3) the failure to warn its passengers that there was no ascending escalator in operation at the Bethesda station.

### III.

To reiterate, Justice Scalia's standard regards a discretionary choice as policy based, and therefore immune, only "if the choice is, under the particular circumstances, one that ought to be informed by considerations of social, economic, or political policy and is made by an officer whose official responsibilities include assessment of those considerations." *Gaubert*, 499 U.S. at 335 (Scalia, J., concurring in part and concurring in the judgment). As my earlier discussion of the METRO's decision not to reassemble Escalator Three indicates, the summary judgment record here would allow a reasonable jury to conclude that the person or persons who made the decision not to reassemble Escalator Three did not have the authority to make policy judgments about whether the increased repair costs of reassembling the escalator outweighed the increased risk to passengers created by leaving the escalator disassembled. Accordingly, I would affirm the district court's refusal to grant the METRO immunity for its decision not to reassemble Escalator Three. I must therefore dissent from part III B of the majority's opinion. Because the record is likewise unclear about who made the decision to brake Escalator One and the decision not to warn passengers about the unavailability of an ascending escalator at the Bethesda station, I would also conclude that the METRO has not proven that it is entitled to immunity for these decisions. I am unclear, however, on whether these two theories of negligence survived the district court's summary judgment ruling. The district court clearly ruled that Smith's family and estate had forecast sufficient evidence for a jury to conclude that the METRO had breached its duty

of care to Smith by failing to provide a safe means of exiting the Bethesda METRO station and that this breach was the proximate cause of Smith's death. In so ruling, the district court seemed to focus mainly on the METRO's alleged failure to properly maintain and repair the escalators at the Bethesda station, but the court did not break down the theories of negligence advanced by Smith's family and estate as explicitly as the majority does today. As a result, I am not sure the district court has decided whether the METRO's decision to use Escalator One as a stationary walker (given the unavailability of any other functioning escalator) and its failure to warn passengers about the unavailability of an escalator at the Bethesda station raise jury questions on the issues of negligence and proximate cause. I would therefore remand for clarification on these points, much as the majority does in Part III E of its opinion.

## IV.

In sum, I acknowledge that if *Gaubert* is the proper standard for applying the METRO Compact's governmental function exception, the majority has correctly disposed of this case. This point underscores the need for close attention to the question of whether we should follow the D.C. Circuit's reading of the Compact. Because I believe that *Gaubert*'s susceptible-to-policy-analysis standard protects a far greater range of conduct than the Compact's framers would have envisioned, I dissent from the majority's decision to adopt the *Gaubert* standard. Instead, I would adopt the standard proposed by Justice Scalia in his *Gaubert* concurrence because it is more consistent with the intent of the framers of the METRO Compact and does a far better job than the *Gaubert* standard of identifying those government decisions that are sufficiently policy based to warrant the protection of the governmental function exception. Applying that standard, I would allow the case to proceed to trial on the question of whether the METRO's decision not to reassemble Escalator Three was negligence and was the proximate cause of Smith's death. I would instruct the district court to clarify on remand whether the other theories of negligence advanced by Smith's family and estate survived the summary judgment ruling.